THE HONORABLE MICHAEL H. SIMON

Brian C. Gruber, WSBA # 32210
Beth Baldwin, WSBA # 46810
ZIONTZ CHESTNUT
2101 Fourth Avenue, Suite 1230
Seattle, Washington 98121
Tel. (206) 448-1230
Fax (206) 448-0962

*Attorneys for Confederated Tribes of the Colville Reservation*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| **AUDUBON SOCIETY OR PORTLAND, WILDLIFE CENTER OF THE NORTH COAST, ANIMAL LEGAL DEFENSE FUND, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF ANIMALS,** | Case No. 3:15-cv-00665-SI |
| Plaintiffs, | DECLARATION OF RANDALL FRIEDLANDER In Support of Motion for Leave to Participate as *Amicus Curiae* |
| v. | |
| **U.S. ARMY CORPS OF ENGINEERS, U.S. FISH AND WILDLIFE SERVICE, USDA WILDLIFE SERVICES,** | |
| Defendants, | |
| and | |
| **NORTHWEST RIVERPARTNERS,** | |
| Intervenor – Defendant. | |

DECLARATION OF
RANDALL FRIEDLANDER

**ZIONTZ CHESTNUT**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

I, RANDALL FRIEDLANDER, hereby declare as follows:

1.      I am the Program Director of the Fish and Wildlife Program of the Confederated Tribes of the Colville Reservation ("Colville") and am an enrolled Colville Tribal member. In my capacity as Program Director I oversee 135 employees in the management of the Tribes' anadromous fisheries (including the Chief Joseph Hatchery program), resident fisheries, and wildlife programs on the Colville Indian Reservation ("Colville Reservation" or "Reservation") and off-Reservation hunting and fishing areas throughout the upper Columbia River basin. I am responsible for ensuring that the Program achieves its mission of protecting and restoring Colville's fish and wildlife resources and regulating their harvest by Tribal members. Additionally, I direct Colville's technical and policy efforts in off-Reservation fishing and hunting activities, such as the Wenatshapam Fishery on Icicle Creek (the "Wenatshapam") conducted by the Wenatchi Tribe (the "Wenatchi"), one of twelve constituent Tribes of the Colville Confederation. These efforts are integral to protecting Colville's fish and wildlife resources and ceremonial and subsistence harvest.

2.      The Colville Reservation is located in north-central Washington and was established by Executive Order in 1872. At that time, the Reservation consisted of all lands within the United States bounded by the Columbia and Okanogan Rivers, roughly 3.0 million acres. In 1891, Colville entered into an agreement with the United States in which the Tribes ceded the lands within the North Half of the 1872 Reservation (the "North Half"). The ceded area consists of roughly 1.5 million acres between the Canadian border and the current northern boundary of the Reservation. In the 1891 Agreement, the Tribes expressly reserved the right to hunt and fish on the North Half, rights which were "not [to] be taken away or in anywise

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

abridged." Thus, Colville holds federal reserved rights to harvest anadromous fish from that portion of Columbia River within the Colville Reservation where such fish are still present (a roughly 5-mile stretch from Chief Joseph Dam downstream to the confluence with the Okanogan River), and from the entire length of the Okanogan River within the United States (including both the on-reservation portion of that river as well as a ceded portion north of the current Reservation boundary). The U.S. Supreme Court and the Ninth Circuit Court of Appeals have upheld the Tribes' reserved hunting and fishing rights within the Reservation and the former North Half. *See Antoine v. Washington*, 420 U.S. 194 (1975) (federally protected fishing and hunting rights on the former North Half); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981) ("preservation of the tribe's access to fishing grounds was one purpose for the creation of the Colville Reservation").

3.    In addition to the federally reserved hunting and fishing rights that Colville possesses on the Reservation and North Half, the Wenatchi possess federally protected fishing rights at Wenatshapam. This right to fish at Wenatshapam was reserved and acknowledged in an 1894 Agreement with the United States. The Wenatchi's federally protected tribal fishing rights at Leavenworth National Fish Hatchery on Icicle Creek were specifically recognized and their importance emphasized by the Ninth Circuit in recent litigation involving Leavenworth Hatchery. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 530-31 (9th Cir. 2010) (citing *United States v. Confederated Tribes of Colville Indian Reservation*, 606 F.3d 698 (9th Cir.2010)). The Wenatshapam fishery is the Tribes' only opportunity to harvest the culturally and nutritionally important spring Chinook salmon.

DECLARATION OF
RANDALL FRIEDLANDER - 2

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

4.      In 1933 the U.S. Bureau of Reclamation began construction of Grand Coulee

Dam on the Colville Reservation and by 1942 the Dam blocked all salmon passage above this

point on the Columbia River and eliminated anadromous fish from over 1100 miles of habitat

above Grand Coulee.   Until the development of the Grand Coulee Dam, anadromous fish were

present throughout Colville's reserved fishing areas within the Reservation and former North

Half.  In 1958 the U.S. Army Corps of Engineers completed construction of Chief Joseph Dam

approximately 52 miles downriver, also on the Colville Reservation. Chief Joseph Dam, at

Columbia River mile 545.1, is the first impassable barrier to anadromous fish migration on the

mainstem Columbia River. These dams prevent salmon and steelhead from returning to a large

part of the Colville Reservation and the historic and vitally important Kettle Falls fishery located

near the present-day city of Kettle Falls, Washington.   As a result, there are only 5 river miles of

the Columbia where anadromous fish are still present within the Colville Reservation.  Spring

Chinook are central to the Tribes' first salmon ceremonies; however, no runs of spring Chinook

currently return to the Colville Reservation.  Anadromous fish are still present throughout the

entire length of the Okanogan River.

5.      Shortly after Congress approved Grand Coulee Dam it also approved four

hatcheries to mitigate for the loss of salmon and steelhead habitat and production resulting from

the dam's construction. Leavenworth Hatchery is one of the three Grand Coulee Dam mitigation

hatcheries. Grand Coulee Dam mitigation hatcheries were also constructed on the Entiat and

Methow Rivers before World War II.

6.      Around thirty years ago, Colville began to inquire about the fourth hatchery,

which was planned for the Okanogan River basin on or near the Colville Reservation and had not

DECLARATION OF
RANDALL FRIEDLANDER - 3

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

been constructed.  Those inquiries led to an extensive, multi-year planning and scientific review process to realize the federal government's promise of the fourth hatchery.  Construction of Chief Joseph Hatchery, a Chinook salmon hatchery on the Colville Reservation, began in 2010 and was completed by mid-2013.  At full production, Chief Joseph Hatchery will produce 2.9 million Chinook annually for release in the Okanogan River basin and the mainstem Columbia, restoring salmon and providing harvest opportunities in the upper Columbia.  Of this production target, 700,000 will be spring Chinook reared, at least initially, from broodstock obtained from Leavenworth Hatchery.

7.      The Colville Tribes are a salmon people. Our culture and subsistence are inextricably linked with the salmon and steelhead runs of the Columbia River. The Wenatchi exercise their right to harvest spring Chinook salmon at Wenatshapam and consider this fishery a critically important cultural and subsistence resource. Our elders tell us that if we take care of the salmon the salmon will take care of us. Every year we honor spring Chinook salmon by conducting a first salmon ceremony. The Wenatshapam fishery is particularly important because it is currently Colville's only spring Chinook fishery.

8.      Upper Columbia River (UCR) steelhead are listed as threatened under the Endangered Species Act, and UCR spring Chinook salmon are listed as endangered.  The anadromous fish that originate within or upstream from the Colville Reservation must migrate the farthest of all fish in the mainstem Columbia River if they are to survive and return to their natal waters to reproduce. They must overcome more obstacles and barriers than fish from farther downstream in the basin. Unless steelhead and spring Chinook return to Colville Reservation or North Half waters in sufficient numbers to allow for subsistence and ceremonial

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

harvest by Colville tribal members, Colville's federally-protected fishing rights will fail to secure their intended benefit.

9.      In 2008, Colville entered into a Fish Accord with the Bonneville Power Administration (BPA), the U.S. Army Corps of Engineers (Corps) and the U.S. Bureau of Reclamation (Reclamation) whereby the federal agencies agreed to provide long-term commitments for funding and implementation activities to support the protection and recovery of salmon and steelhead listed under the ESA.  This historic agreement recognizes the Colville Tribes as a governmental partner in the pursuit of protection and recovery of Upper Columbia listed anadromous fish.  As a result, Colville has undertaken major projects under the Accord to enhance Chinook and steelhead populations in the upper Columbia.

10.      Under the Fish Accord, Colville has greatly increased its long-standing habitat restoration work in the Okanogan River basin. Colville has planned, designed, and implemented numerous projects in the Okanogan basin, opening tributary reaches inaccessible for decades, providing additional flows, and protecting riparian habitat.  Completed projects have already demonstrated immediate benefits to UCR steelhead, now that they are able to access some of the most important habitat in the basin.

11.      As described above, in 2013 Colville completed over a decade of planning and construction of Chief Joseph Hatchery (CJH), a state-of-the-art facility where spring and summer/fall Chinook will be reared and released.  Spring Chinook from Leavenworth Hatchery have been reared at CJH since 2013 and Colville just recently released the first yearling spring Chinook reared at the hatchery to the Columbia and Okanogan Rivers.

DECLARATION OF
RANDALL FRIEDLANDER - 5

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

12.    Colville recognizes that avian predation of ESA-listed (and non-listed) salmonids in the Columbia River estuary is a problem that requires decisive action. Cormorants in the Columbia River estuary are having a disproportionate impact on UCR steelhead, undermining Colville's work to restore the steelhead population native to the Okanogan River. Furthermore, spring Chinook released from Chief Joseph Hatchery will have to run the avian gauntlet in the estuary in order to return to the upper Columbia.

13.    For the past three years, Colville has been advocating for the Corps and the U.S. Fish and Wildlife Service to take an aggressive approach to avian predation management. In particular, Colville has expressed concerns that the agencies are addressing the issue as a bird problem, when the Tribes see it as a fish problem.

14.    Colville engaged the Corps in government-to-government consultation over the Corps' plan to manage cormorants in the Columbia River estuary ("Cormorant Plan") in December 2012. Since that time, Colville has submitted at several comment letters to the Corps as part of the NEPA process surrounding development of the Cormorant Plan. True and correct copies of these comments are attached to my declaration as Exhibit A.

15.    Colville representatives have participated in numerous meetings of the Avian Working Group, which consists of representatives of federal, tribal and state agencies, to discuss the preparation of the Cormorant Plan. Throughout those comments and meetings, Colville has repeatedly advocated for a more "fish-centered" approach to avian predation in general, and specifically for an aggressive reduction of the Estuary cormorant population by 90%, using lethal take of adults and egg removal. *See* Ex. A at pdf p. 3 (Dec. 21, 2012, letter at p. 3). Although Colville advocated for greater reduction of the East Sand Island nesting colony than was

DECLARATION OF
RANDALL FRIEDLANDER - 6

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

ultimately adopted by the Corps in the Cormorant Plan, Colville supports the plan and believes it

is an essential part of the broader effort to protect listed salmon and steelhead.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May, 2015.

Randall Friedlander

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

# EXHIBIT A




### The Confederated Tribes of the Colville Reservation
P.O. Box 150, Nespelem, WA 99155
(509) 634-2200
FAX: (509) 634-4116

December 21, 2012

*By email and first-class mail*

Ms. Sondra Ruckwardt, Project Manager
U.S. Army Corps of Engineers, Portland District
P.O. Box 2946
Portland, Oregon 97208
Email: Cormorant-EIS@usace.army.mil

Re:    *Colville Confederated Tribes' Comments on Scoping of Environmental Impact
        Statement on Double-Crested Cormorant Management to Reduce Predation of
        Juvenile Salmonids in the Columbia River Estuary - Clatsop County, Oregon
        (CENWP-PM-E-12-06)*

Dear Ms. Ruckwardt,

The Colville Confederate Tribes (CCT) submits the following comments for the Corps of Engineers' scoping regarding the preparation of an environmental impact statement (EIS) for double-crested cormorant (DCCO) management in the Columbia River estuary.

The avian predation issue is of great importance to CCT. We are deeply concerned about the impact that cormorants, Caspian terns, and other avian species throughout the Columbia River basin are having on salmon and steelhead populations that CCT has a federally reserved right to harvest and which form a core part of Colville subsistence and ceremonies. As you are probably aware, CCT has made a substantial investment, along with the Corps of Engineers and other federal agency partners, in recovering salmon and steelhead in the upper Columbia, including the design and construction of a major new hatchery at Chief Joseph Dam and many habitat restoration projects. A management plan for double-crested cormorants that protects the gains in fish survival we have worked so hard to achieve is essential – for our people's well-being and for the Corps to meet its trust responsibility to uphold the Tribes' rights and interests.

DECLARATION OF
RANDALL FRIEDLANDER- Ex. A, p. 2

ACE_0093057

*Sondra Ruckwardt*
*Re: EIS for Cormorant Management in Estuary*
*December 21, 2012*
*Page 2 of 6*

The enormity of the DCCO predation issue in the estuary is now clearly apparent. For three consecutive years, cormorants[1] at the East Sand Island colony consumed an average of 20 million juvenile salmonids per year. We believe that this number, which is double the predation level observed as recently as 2008, represents a conservative estimate, as the proportion of PIT tags recovered from East Sand Island and other factors in determining the DCCO predation rate require additional study. The most recent published data indicates that in 2011, DCCO at ESI "have consumed approximately 22.6 million juvenile salmonids, the highest smolt consumption estimate ever recorded" for the colony. FCRPS BiOp 2011 Annual Progress Report at 20. DCCO predation now greatly surpasses consumption of salmonid smolts by Caspian terns at East Sand Island, although tern predation continues to remain too high in spite of ongoing management efforts. Aggressive management of the DCCO colony at East Sand Island is appropriate in light of its recent growth and current size relative to other DCCO colonies in western North America.

We provide the following specific comments for the public record in the Corps' scoping process. As development of the management plan is an ongoing process, we anticipate that CCT will continue to provide input to the Corps and other agencies developing the EIS, whether through government-to-government consultation or as part of the public process.

1.      Any plan developed for the management of cormorants in the estuary must recognize the central purpose of such a plan – the protection of Columbia River salmon and steelhead. The development of the DCCO management plan is required by the 2008 Federal Columbia River Power System (FCRPS) Biological Opinion (BiOp) and should reflect its central goal of protecting anadromous salmonids from the particularized threat of DCCO predation in the estuary. Avian management to date has been focused too much on the birds themselves, with the result that managers have lost sight of the foundational purpose of the management plan. To properly reflect the requirements of the BiOp and to best achieve protections for numerous ESA-listed species whose survival is at stake, the plan must be "fish-centered." That is, all management actions must be aimed at and measured against the goal of immediately and substantially reducing predation of juvenile salmonids, thereby facilitating the achievement of adult escapement goals identified in the BiOp for ESA-listed species. To this end, the Corps should ensure that the plan is developed in conjunction with fish biologists and has clear fish-based metrics to guide and evaluate implementation of the plan.

2.      The management plan must include aggressive action to achieve immediate reduction in salmonid mortality. After two years of research regarding DCCOs at East Sand Island, experimental measures to reduce East Sand Island nesting areas have failed to achieve any meaningful reduction in DCCO population. In light of this research – and the continued high level of overall predation by birds in the estuary – the Corps should proceed on an aggressive track to reduce the size of the DCCO colony and dramatically reduce predation on

[1] CCT understands there is a population of Brandt's cormorants that nests on East Sand Island and forages primarily in marine waters. All references to "cormorant" in this letter are to double-crested cormorants, unless otherwise specified.

DECLARATION OF
RANDALL FRIEDLANDER- Ex. A, p. 3

ACE_0093058

*Sondra Ruckwardt*
*Re: EIS for Cormorant Management in Estuary*
*December 21, 2012*
*Page 3 of 6*

juvenile salmonids. The management plan should reflect the fact that two years of non-lethal efforts failed to yield any benefits for fish, and provide for the use of lethal techniques early in the implementation schedule. CCT does not seek the needless killing of birds, but believes that such action is warranted given the priority of protecting listed salmonids, the ineffectiveness of non-lethal efforts to date, and the need for immediate reduction in salmonid mortality. At a minimum, egg removal should be implemented in year one of the management plan to halt internal recruitment to the colony. Lethal take of adult cormorants should be utilized in the second year of the plan if the combination of hazing and egg removal does not show tangible reductions in salmonid predation by this colony. This approach is appropriate given available information which demonstrates the cormorant population in the estuary is out of balance with the ecosystem and has a devastating impact on juvenile salmonids. A critical component of the plan requires that DCCOs must not relocate to areas where they will continue to prey on Columbia River salmonids. Lyons and Roby, 2011 Draft Benefits Analysis at 7. Dissuasion from East Sand Island will mean nothing unless it is coupled with measures to ensure that DCCOs are not continuing to take fish from the Columbia River basin. Although removal of DCCOs from the estuary may be achieved solely by a thorough "push," the plan should recognize that lethal techniques will also achieve this important aspect of a plan.

3.     The plan must include robust fish-centered adaptive management. The Corps must monitor and assess whether it is achieving the plan's fish-based metrics and make changes if the predicted reduction in salmonid predation is not realized. Such an adaptive approach should focus on the hardest-hit salmonid species, the Upper Columbia River (UCR) steelhead. Adaptive management is appropriate for conservation measures taking place in a complex system, where information is being developed but immediate action is required. The need for fish-based adaptive management of DCCO predation is evident when one considers that Caspian tern predation rates are not decreasing in response to the tern nesting habitat reduction on East Sand Island mandated by RPA 45 of the BiOp, despite the predicted benefits to be gained from a reduction in colony size. *See* FCRPS BiOp 2011 Annual Progress Report at 20 (despite a 67% reduction in nesting area and a 30% decrease in colony population since the 2008 BiOp, Caspian terns nesting at the East Sand Island colony consumed approximately the same number of smolts as the previous two years). In short, adaptive management that concentrates solely on bird-centered metrics will not achieve the BiOp's objectives.

Adaptive management can also modify implementation in the other direction, *i.e.*, if the desired benefits for fish can be achieved with a smaller reduction in colony size. However, in light of the recent trends in salmonid mortalities, uncertainties in the information available and the need for immediate protections for listed fish, the plan should begin by placing the burden on the cormorants, and not where it has been for the past twenty years – on the fish.

4.     CCT understands that the Corps will be considering in detail an alternative in which 100% of DCCOs at East Sand Island would be removed. We support inclusion of this alternative because it is most likely to lead to the maximum reduction in DCCO predation on out-migrating salmonids. However, CCT also recognizes that this alternative may not be

DECLARATION OF
RANDALL FRIEDLANDER- Ex. A, p. 4

*Sondra Ruckwardt*
*Re: EIS for Cormorant Management in Estuary*
*December 21, 2012*
*Page 4 of 6*

feasible from a management and public policy perspective and suggests that significant reductions in predation can be achieved with a somewhat smaller 90% reduction in the size of the colony. If the colony at East Sand Island were reduced to 10% of its current size of approximately 13,000 breeding pairs, it would allow DCCOs to remain a viable component of the estuary ecosystem while greatly reducing their impacts on salmonids. With this reduction, the colony would still be the largest in western North America, thus maintaining the ecological niche for DCCOs in the estuary and the Pacific Northwest as a whole.

The EIS needs to recognize and consider CCT's interests in Columbia Basin salmonids. Situated on a 1.4 million-acre reservation at the confluence of the Okanogan and Columbia Rivers, CCT is directly impacted by the over-sized DCCO colony at the mouth of the river. It is well-established that DCCOs as East Sand Island are having a disproportionate impact on UCR steelhead, one population of which is native to the Okanogan River. Impacts to upper Columbia salmonids are of critical interest because CCT's federally protected fishing rights on the Reservation and the former North Half. *See Antoine v. Washington*, 420 U.S. 194 (1975) (federally protected fishing and hunting rights on the former North Half); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981) ("preservation of the tribe's access to fishing grounds was one purpose for the creation of the Colville Reservation"). These rights are no less protected or vital to CCT than fishing rights in the lower Columbia and must be considered by the Corps - and the U.S. Fish and Wildlife Service (FWS) – as it develops the management plan. For the past several years, CCT has been designing and constructing a major hatchery below Chief Joseph Dam. The Chief Joseph Hatchery is expected to have fish on station in 2013 and when it is operating at full capacity, will produce approximately 2 million summer/fall Chinook and 900,000 spring Chinook for release directly from the hatchery and in the Okanogan River. These fish will need to run the gauntlet in the estuary in order to return to the upper Columbia both to restore their wild populations and to fulfill the subsistence and ceremonial needs of the Colville people.

The focus of the management plan and EIS should be the impacts of DCCO predation on listed salmon and steelhead species. Nonetheless, non-listed UCR salmonids are critical to CCT for the reasons described above. These include sockeye and summer/fall Chinook. CCT harvest of these runs under the Tribes' federally protected fishing rights must be protected by the United States. Thus, non-listed salmonids which may be impacted by DCCO predation in the estuary are subject to the Corps and the FWS' trust responsibility to protect the rights and interests of CCT.

5.      The issue of avian predation in the estuary presents an opportunity for the Corps to make significant gains in fish survival and address skeptics of the Government's commitment to protecting listed salmonids. If gains in fish survival are not made through reducing predation by the over-sized DCCO colony in the estuary, they will likely need to be made elsewhere in the Columbia basin. That avian predation is part of a comprehensive approach to protecting salmonids is made clear by the inclusion of the management plan in the FCRPS BiOp. In considering this issue in the EIS, the Corps should evaluate what other costs will need to be

DECLARATION OF
RANDALL FRIEDLANDER- Ex. A, p. 5

ACE_0093060

*Sondra Ruckwardt*
*Re: EIS for Cormorant Management in Estuary*
*December 21, 2012*
*Page 5 of 6*

incurred by the Government to achieve comparable fish survival gains in other areas of the basin. This information will assist the public and decision makers in understanding the costs and benefits of managing avian predation as compared to other management efforts to improve fish survival.

6.      The EIS must consider the potential impacts of climate change.  Although the impacts of a changing climate may not be readily apparent in considering different options for avian management, CCT suggests a couple of ways in which climate appears relevant.  First, there have been observations that recent higher predation levels are correlated with high river flows during the spring, when DCCOs are nesting at East Sand Island.  Climate change is likely to shift the Columbia River's hydrograph to an earlier runoff, thus normalizing the larger, spring flow scenario.  In addition, potential changes to the Columbia River Treaty and its implementation as early as 2024 may also lead to a significant change in the spring-time management of river flows.  Second, the recent Status Assessment of DCCOs in western North America (Adkins 2010 at 33) suggests that the availability of forage fish species for coastal populations of cormorants may be affected by climate change and ocean conditions.  A similar effect may occur in forage available in the estuary, where a reduction in availability of forage species like anchovy and herring could potentially lead DCCOs to increase predation on readily-available salmonids

7.      While CCT believes there is sufficient information to warrant an aggressive fish-centered management of DCCOs in the estuary at this time, clearly there are gaps in the understanding of the DCCO-salmonid relationship, particularly with the large increase in predation in recent years.  The management plan should continue to incorporate and encourage research on estuary DCCOs and their impacts on out-migrating salmonids.   Research should continue into questions of vital importance to the success of the management plan, particularly the degree to which other smolt mortality factors may compensate for reductions in mortality from cormorant predation.  While the 2011 Benefits Analysis assumes 0% compensatory mortality—a position we think is correctly aligned with a fish-centered management approach— there are still significant uncertainties about the level of compensatory mortality and the factors that may influence it.  Additional research could potentially resolve this key issue.  The management plan could also benefit from continuing research into observed differential predation rates between hatchery-reared and wild smolts and between smolts migrating in-river and transported smolts. The 2011 Benefits Analysis acknowledges that "substantial" and "significant" differences in mortality exist between these categories of smolts yet no consistent patterns were observed.  Additional research could identify patterns in the differential predation rates which would inform future management decisions and hatchery operations.  Finally, estimates of DCCO predation on salmonids rely almost exclusively on information derived from PIT tags deposited in the DCCO colony.  Additional research should continue to improve the analysis of PIT tag detection and deposition rates to yield more accurate estimates of avian predation on salmonid smolts.

DECLARATION OF
RANDALL FRIEDLANDER- Ex. A, p. 6

ACE_0093061

*Sondra Ruckwardt*
*Re: EIS for Cormorant Management in Estuary*
*December 21, 2012*
*Page 6 of 6*

8.    One of the information pages available on the Corps' estuary management plan website indicates that the FWS only issues a depredation permit after the applicant "has tried a variety of non-lethal management activities which have proven ineffective." A similar requirement appears on the publicly available FWS form application for a Federal Fish and Wildlife Permit. It would be helpful if the Corps (and FWS) explained in the EIS the basis for this requirement, including whether it is required by federal law or regulations, and whether it is applicable to any depredation of DCCOs undertaken by the Corps pursuant to the proposed management plan at East Sand Island.

Sincerely yours,

*[signature]* 12-19-12

Randall Friedlander
Acting Director
CCT Fish & Wildlife Department

cc:  Stanley Speaks, Northwest Regional Office Director, BIA

DECLARATION OF
RANDALL FRIEDLANDER- Ex. A, p. 7

ACE_0093062

August 13, 2014

*By email and first-class mail*

Ms. Sondra Ruckwardt, Project Manager
U.S. Army Corps of Engineers, Portland District
P.O. Box 2946
Portland, Oregon 97208
Email: Sondra.K.Ruckwardt@usace.army.mil

> Re:    *Comments of Confederated Tribes of the Colville Reservation on Draft Environmental Impact Statement on the Double-crested Cormorant Management Plan to Reduce Predation of Juvenile Salmonids in the Columbia River Estuary*

Dear Ms. Ruckwardt,

The Colville Confederated Tribes (CCT) submits the following comments on the Draft Environmental Impact Statement (DEIS) prepared by the U.S. Army Corps of Engineers regarding double-crested cormorant (DCCO) management in the Columbia River estuary. The Tribes support the preferred Alternative C: Culling with Integrated Non-Lethal Methods Including Limited Egg Take. The preferred alternative provides for significant, near-term reductions in the double-crested cormorant population on East Sand Island to improve juvenile salmonid survival while maintaining a viable population of double-crested cormorants on East Sand Island.

As CCT wrote in its December 2012 scoping comments for this EIS process, we are deeply concerned about the impact that cormorants, Caspian terns, and other avian species throughout the Columbia River basin are having on salmon and steelhead populations. These fish form a core part of Colville subsistence and ceremonies, and CCT has a federally protected right to harvest them. We appreciate the Corps' description, at DEIS pp. 3-52, 3-56 and 3-57, of CCT's federally protected fishing rights in the Columbia River and the Tribes' subsistence and ceremonial fisheries.

In addition, CCT has devoted substantial resources in the basin-wide effort of tribes, states and the federal government to protect and recover ESA-listed salmonids and enhance those populations that are not at risk of extinction. CCT, along with the Corps and other federal agency partners, has completed a major new hatchery at Chief Joseph Dam and many habitat restoration projects designed to improve habitat utilized by the Okanogan River population of the Upper Columbia River steelhead distinct population segment (DPS). The Chief Joseph Hatchery was completed and dedicated in June 2013, and at full capacity will produce approximately 2 million summer/fall Chinook and 900,000 spring Chinook for release directly from the hatchery and in the Okanogan River. With the recent approval of a non-essential

DECLARATION OF
RANDALL FRIEDLANDER- Ex. A, p. 8

experimental population, hatchery operations will include rearing up to 200,000 Methow Composite spring Chinook for release in the Okanogan River and establishment of a fourth population in this endangered ESU starting in the fall of 2014. All of the fish produced at Chief Joseph Hatchery, the farthest point on the Columbia from East Sand Island accessible to anadromous fish, will have to run the gauntlet in the estuary (as well as inland avian colonies) in order to reach the ocean and, ultimately, return to the upper Columbia both to restore their wild populations and to fulfill the subsistence and ceremonial needs of the Colville people.

CCT strongly supports the DEIS' purpose of reducing cormorant populations on East Sand Island to levels "at or below" the target established by Reasonable and Prudent Alternative 46 in the 2014 Federal Columbia River Power System Supplemental Biological Opinion (Supplemental BiOp). In light of the need for an immediate and dramatic turnaround in double-crested cormorant predation on juvenile salmonids in the estuary, the Preferred Alternative provides a clear choice to achieve near-term reductions in the cormorant population without the uncertainties, expense and direct and indirect effects on other resources of dispersing approximately 15,000 birds from the 145-mile estuary after they are dissuaded from East Sand Island. Dispersal presents both opportunities and risks. If successful, it reduces the number of cormorants that must be culled to achieve benefits for fish; if the birds do not leave the estuary, or, worse, travel to inland areas in the basin where listed salmonids would make up a greater percentage of their diets, little or no gains for fish may be realized. Moreover, the Preferred Alternative clearly achieves greater benefits for listed fish than a primarily non-lethal approach, and as, CCT has emphasized throughout the development of the management plan, this objective should be the driving force behind the plan and its long-term implementation. (DEIS at 4-33, Tables 4-2 and 4-3). The Preferred Alternative is also likely to maintain double-crested cormorants as a meaningful element of the estuary and west coast ecosystems, because over 5,000 breeding pairs would remain on East Sand Island--easily making it many times larger than any other double-crested cormorant colony in the western population.

We wish to emphasize again that an appropriate fish-centered approach in the plan must evaluate its success or failure based not on the number of birds remaining but on the benefits that accrue to listed salmonids from reducing double-crested cormorant predation. In short, the plan must not be fixated on the number of birds specified in the Supplemental BiOp, but rather on the objective of closing the survival gap for listed UCR steelhead (and, as a result, for other listed salmonids). Under the Management Plan incorporated into the DEIS, "[m]anagement would be considered successful once the DCCO target colony size is achieved and maintained, and the Corps would continue to implement non-lethal methods, as necessary, to maintain the target size." (DEIS at p. 5-11). Assessment of predation rates via PIT tag recoveries after the breeding season during Phase I would ostensibly occur; however, predation rates are not factored into adaptive management because "the time period is too short to determine trends." (DEIS at p. 5-13, Table 5-4). PIT tag recovery during Phase II would likewise not factor into adaptive management "until data has been collected for [a] sufficient period of time (5-10 years) due to seasonal and annual variability in predation rates." (DEIS at p. 5-16, Table 5-6). However, it is likely that PIT tag recovery data could provide reliable information relating to cormorant

*Sondra Ruckwardt*
*Re: Draft EIS for Cormorant Management in Estuary*
*August 13, 2014*
*Page 3 of 4*

_____

predation on ESA-listed salmonids that would enable the Corps to assess plan implementation and the potential need for adaptive management within a shorter time frame. For example, in Evans et al. (2012), researchers were able to determine predations rates for a wide range of avian predators and salmonid species and populations, including East Sand Island double-crested cormorant predation on UCR steelhead, based on a four-year PIT tag study. Accordingly, the Corps should to add to the Management Plan an explicit adaptive management option in which it would take additional management action in the near term if predation rates are not reduced commensurate with population reductions. As CCT has noted in other comments, management of Caspian terns at East Sand Island has not followed predicted outcomes with respect to predation reduction and decreases in abundance. In the Tribes' view, a similar near-term result for double-crested cormorant management in the estuary should result in additional actions to achieve the fish survival increases expected by the Supplemental BiOp. It would be unacceptable to wait 10 or more years before an adaptive management response is triggered.

In summary, while CCT remains concerned about the high level of salmonid predation by double-crested cormorants nesting at East Sand Island and the corresponding challenges it poses to CCT's and others' salmon and steelhead recovery efforts, the Tribes firmly support the adoption of Alternative C with the addition of a near-term adaptive management response option should salmonid predation rates not decrease in parallel with double-crested cormorant abundance. We look forward to the Corps' implementation of the Management Plan and the significant benefits to the Columbia Basin's salmon and steelhead that will follow. As refinement and implementation of the management plan is an ongoing process, CCT intends to continue providing input to the Corps and other agencies through government-to-government consultation or other processes.

Sincerely yours,

Randall Friedlander
Program Director
CCT Fish & Wildlife Department

cc: Elisa Carlsen, U.S. Army Corps of Engineers (Elisa.Carlsen@usace.army.mil)

DECLARATION OF
RANDALL FRIEDLANDER- Ex. A, p. 10

*Sondra Ruckwardt*
*Re: Draft EIS for Cormorant Management in Estuary*
*August 13, 2014*
*Page 4 of 4*

**REFERENCES**

Evans, A. F., N. J. Hostetter, D. D. Roby, K. Collis, D. E. Lyons, B. P. Sandford, and R. D. Ledgerwood. 2012. Systemwide evaluation of avian predation on juvenile salmonids from the Columbia River based on recoveries of Passive Integrated Transponder tags. Transactions of the American Fisheries Society 141:975-989.

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties in this matter who are registered with the Court's CM/ECF filing system.


s/ Brian C. Gruber

DECLARATION OF
RANDALL FRIEDLANDER- Certificate of Service

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230