THE HONORABLE MICHAEL H. SIMON

Brian C. Gruber, WSBA # 32210
Beth Baldwin, WSBA # 46810
ZIONTZ CHESTNUT
2101 Fourth Avenue, Suite 1230
Seattle, Washington 98121
Tel. (206) 448-1230
Fax (206) 448-0962

*Attorneys for Amicus Curiae*
*Confederated Tribes of the Colville Reservation*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| **AUDUBON SOCIETY OF PORTLAND**, **WILDLIFE CENTER OF THE NORTH COAST, ANIMAL LEGAL DEFENSE FUND, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF ANIMALS**, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. ARMY CORPS OF ENGINEERS**, **U.S. FISH AND WILDLIFE SERVICE, USDA WILDLIFE SERVICES**, <br><br> Defendants, <br> and <br><br> **NORTHWEST RIVERPARTNERS**, <br><br> Intervenor – Defendant. | Case No. 3:15-cv-00665-SI <br><br><br> BRIEF OF *AMICUS CURIAE* CONFEDERATED TRIBES OF THE COLVILE RESERVATON IN SUPPORT OF FEDERAL DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION |

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION

**ZIONTZ CHESTNUT**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................... 1

**STANDARD OF REVIEW** ................................................................................................ 2

**ARGUMENT** ....................................................................................................................... 3

   **I.**   **Plaintiffs Fail to Demonstrate Irreparable Harm Warranting a Preliminary Injunction.** ....... 3

   **II.**  **Plaintiffs Cannot Demonstrate that the Public Interest and the Balance of Equities Weigh in their Favor.** ............ 9

   **III.** **Plaintiffs Are Not Likely To Succeed On The Merits.** ............................................. 14

**CONCLUSION** ................................................................................................................... 19

TABLE OF AUTHORITIES

**Federal Court Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................... 3

*Antoine v. Washington*, 420 U.S. 194 (1975) ........................................................................... 12

*Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) ........................................ 12

*Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166 (9th Cir. 2011) ............................................ 4, 14

*Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205 (D. Mont. 2009) ............................... 4, 5

*Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967 (9th Cir. 2013) ............................................... 9

*Earth Island Inst. v. Carlton*, No. CIV. S-09-2020 FCD, 2009 WL 9084754 (E.D. Cal. Aug. 20, 2009) *aff'd*, 626 F.3d 462 (9th Cir. 2010) ............................................ 3

*Fund for Animals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998) ..................................................... 4

*Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) ............................................ 4

*Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000) ...................................... 5

*Humane Soc'y of U.S. v. Watt*, 551 F. Supp. 1310, (D.D.C. 1982), *aff'd*, 713 F.2d 865 (D.C. Cir. 1983) ... 6

*League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ............................................ 9, 11

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir.1996) ..................................................... 10

*Mille Lacs Band of Chippewa Indians v. State of Minn.*, 864 F. Supp. 102 (D. Minn. 1994) *aff'd sub nom. Mille Lacs Band v. Cnty. of Aitkin*, 66 F.3d 332 (8th Cir. 1995) ............................................ 13

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (*en banc*) ....................................................... 3

*Missouri v. Holland*, 252 U.S. 416 (1920) ............................................................................. 10

*Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504 (W.D. Wash.1988) ................................. 13

*N. Dakota v. United States*, 460 U.S. 300 (1983) .................................................................... 10

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ............................................ 11
*Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508 (9th Cir. 1994) ................................................ 4, 5
*Native Songbird Care & Conservation v. LaHood*, No. 13-CV-02265-JST, 2013 WL 3355657 (N.D. Cal. July 2, 2013) ........................................................................................................................... 11
*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) ...................................................................... 6, 10, 11
*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979) ..... 12
*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ........................................................ 2, 3

**Statutes and Regulations**

16 U.S.C. § 1536(b)(4) .......................................................................................................................... 5
16 U.S.C. § 701 ................................................................................................................................ 5, 6
16 U.S.C. § 704 ................................................................................................................................ 5, 6
50 C.F.R. § 21.42 ................................................................................................................................. 5

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - ii

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

*Amicus curiae* Confederated Tribes of the Colville Reservation ("Colville") submits the following brief in support of Federal Defendants' opposition to the Audubon Society of Portland et al.'s Motion for Preliminary Injunction (Dkt. 19).

## INTRODUCTION

Near the mouth of the Columbia River, a 60-acre dredge-spoil island owned by the U.S. Army Corps of Engineers (Corps) hosts tens of thousands of migratory seabirds which come to the island to roost, build nests, mate, and bear their young for part of the year.  The seabird colonies on East Sand Island include approximately 30,000 double-crested cormorants[1] packed onto a guano-covered, 12-acre sand spit on the western half of the island.  The unprecedented numbers of birds using East Sand Island are wreaking havoc on the Columbia River estuary ecosystem.  Cormorants alone eat on average nearly 12 million juvenile salmonids annually. Those fish are revered by Colville and other tribes of Columbia River basin whose culture and subsistence revolve around salmon and gave rise to federally protected harvest rights.  Federal, state, and tribal governments painstakingly manage Columbia basin salmon and steelhead, many species of which are listed as endangered or threatened under the Endangered Species Act (ESA).

Far from being scapegoats as Plaintiffs allege, the cormorants are themselves a significant part of the problem facing interior Columbia basin salmon and steelhead species; on average, they remove as many juvenile salmonids from the Columbia River as a hydroelectric

---

[1] Colville will follow the convention in this case and refer to double-crested cormorants as "cormorants" and other species of cormorants by their specific names.

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT OF FEDERAL DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 1

dam.[2]  The situation cries out for a solution, which the National Marine Fisheries Service (NMFS) has provided: reduce the number of cormorants on East Sand Island by about 35% in the next four years.  The Corps has dutifully developed a plan to implement NMFS' solution, after considering the input of nearly everyone interested in the outcome (including Plaintiffs, tribes, states, stakeholders and other citizens).

Now before this Court lies the task of sifting through the many competing interests, harms, and arguments prompted by the Corps' imminent implementation of the Cormorant Plan.  As it does so, one theme easily rises to the top:  the fish are endangered, and the birds are not.  Moreover, Plaintiffs have not demonstrated that irreparable harm is likely in Year 1 of the Plan, the relevant time frame for this preliminary injunction motion, because the western population of cormorants will not come close to dipping below sustainable levels determined by the U.S. Fish and Wildlife Service (FWS) after a single year of implementing the plan.   Under these circumstances, the Court should deny Plaintiffs' request to enjoin the Corps from putting its cormorant plan into action as planned and proceed to the merits of this action.

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary remedy never awarded as of right."  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008).  In each case, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and "should pay particular regard for the public

---

[2] U.S. Army Corps of Engineers, *Double-Crested Cormorant Management Plan to Reduce Predation of Juvenile Salmonids in the Columbia River Estuary* ("FEIS") at 1-24, *available at* http://www.nwp.usace.army.mil/Portals/24/docs/environment/EIS/Cormorants/Final_EIS_Corm orant_Feb2015.pdf.  We refer to the management plan described by Alternative C-1 of the FEIS as the "Cormorant Plan" or "Plan."

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 2

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

consequences in employing the extraordinary remedy of injunction." *Id.* To prevail in their request for a preliminary injunction, Plaintiffs must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in their favor; and (4) an injunction is in the public's interest. *Id.* at 20. The *Winter* Court emphasized that the irreparable injury must be "likely" and rejected the Ninth Circuit's test requiring only a "possibility" of such harm as "too lenient." *Id.* at 22. Furthermore, "[n]o longer is there any presumption of such harm in an environmental case, nor is a showing of a mere possibility of irreparable harm sufficient." *Earth Island Inst. v. Carlton*, No. CIV. S-09-2020 FCD, 2009 WL 9084754, at *27 (E.D. Cal. Aug. 20, 2009) *aff'd*, 626 F.3d 462 (9th Cir. 2010).

Although the Ninth Circuit has determined that its "serious questions" approach to preliminary injunctions survives *Winter*, this Court must, in addition to finding that irreparable injury is likely, determine that the balance of hardships tips sharply toward the plaintiff and an injunction would be in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). In other words, plaintiffs must "make a showing on all four prongs." *Id.* at 1135 (citing *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (*en banc*)).

## ARGUMENT

## I.    Plaintiffs Fail to Demonstrate Irreparable Harm Warranting a Preliminary Injunction.

Plaintiffs are required to establish a *likelihood* of irreparable harm. *Winter*, 555 U.S. at 22. Where, as here, a plaintiff fails to do so, the court "need not address . . . the remaining elements of the preliminary injunction standard." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166,

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 3

Zɪᴏɴᴛᴢ Cʜᴇsᴛɴᴜᴛ
2101 Fᴏᴜʀᴛʜ Aᴠᴇɴᴜᴇ, Sᴜɪᴛᴇ 1230
Sᴇᴀᴛᴛʟᴇ, Wᴀsʜɪɴɢᴛᴏɴ 98121
Tᴇʟ. (206) 448-1230

1174 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 20*).*  Plaintiffs cite several cases that analyzed whether a preliminary injunction should issue based on claims of environmental and aesthetic harms; however, <u>all</u> of those cases pre-date *Winter*, and at least one uses a "possibility of irreparable harm" standard that the *Winter* Court held impermissible. *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 219 (D.D.C. 2003) (applying lesser standard of "possibility of irreparable injury" where plaintiff demonstrated "probable success on the merits"); *see also Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (finding "the presence of an irreparable harm" and no harm to other interested parties in non-MBTA case).

Irreparable harm, if it is to have any meaning, must be distinguished from lesser harms because courts are not required to grant an injunction for every violation of the law.  *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994).  There is a dearth of case law interpreting this prong of the *Winter* test in the context of Migratory Bird Treaty Act (MBTA) claims.[3]  However, ESA case law provides useful guidance, as courts have specifically determined that take of individual members of a species does not constitute irreparable harm for purposes of that statute which, like the MBTA, protects species or populations rather than individuals.  *See Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009).  "To consider any taking of a listed species as irreparable harm would produce an irrational result" because the ESA permits take of a listed species under certain conditions; if the death of a single individual "constituted irreparable harm, no species could be taken before it is delisted.

---

[3] Plaintiffs' arguments regarding irreparable harm caused by the proposed killing of cormorants pursuant to the Cormorant Plan, *see* Prelim. Inj. Mot. at 25-28, echo their MBTA claims against the Federal Defendants, *see* Compl. ¶¶  182-186 (Seventh Claim for Relief ) and ¶¶ 196, 197 (Tenth Claim for Relief) (ECF No. 1); thus, we analyze their claims of irreparable harm absent an injunction in the context of the MBTA.

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 4

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

Such a proposition would render the operative provisions of other environmental laws useless." *Id.* (citing 16 U.S.C. § 1536(b)(4) and *Burlington Northern*, 23 F.3d at 1511). In keeping with the ESA's purpose to prevent endangerment and extinction of species, "the measure of irreparable harm is taken in relation to the health of the overall species rather than individual members." *Id.* at 1210.

The MBTA allows take of migratory birds where they have "become seriously injurious to the agricultural or other interests in any particular community." *Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882, 885 (D.C. Cir. 2000). The statute's purpose is "to aid in the restoration of such birds in those parts of the United States adapted thereto where the same have become scarce or extinct, and also to regulate the introduction of American or foreign birds or animals in localities where they have not heretofore existed." 16 U.S.C. § 701. The MBTA delegates authority to the Secretary of the Interior to

> from time to time, having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds, to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of any such bird, or  any part, nest, or egg thereof, and to adopt suitable regulations permitting and governing the same, in accordance with such determinations, which regulations shall become effective when approved by the President.

16 U.S.C. § 704. Pursuant to this authority, the Department of the Interior has promulgated regulations allowing the killing of migratory birds that "have accumulated in such numbers in a particular area as to cause or about to cause serious damage to agricultural, horticultural, and fish cultural interests . . . ." 50 C.F.R. § 21.42. This section of the MBTA also allows take of migratory game birds for purely recreational purposes like sport hunting, so long as such hunts

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 5

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

are authorized by the Secretary of the Interior and are not contrary to the underlying international treaties and conventions that the MBTA implements.  *See, e.g., Humane Soc'y of U.S. v. Watt*, 551 F. Supp. 1310, 1318 (D.D.C. 1982), *aff'd*, 713 F.2d 865 (D.C. Cir. 1983).

Harm to individual, or even several thousand individual, birds must be measured against the harms that the MBTA is meant to prevent.  The purpose of the MBTA is to implement international treaties providing varying levels of protections to migratory birds.  The statute is meant to "aid in the restoration of such birds in those parts of the United States adapted thereto where the same have become scarce or extinct . . . ." 16 U.S.C. § 701 (emphasis added).  The statute implicitly recognizes that at times, the distribution and abundance of migratory birds may warrant their killing to further other public purposes.  *See* 16 U.S.C. § 704.  Unlike the ESA, which "shows clearly that Congress viewed the value of endangered species as 'incalculable,'" *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 187 (1978), the MBTA provides that the value of migratory birds does not always outweigh the need to protect other public resources.  Unlike the ESA, "the MBTA does not impose upon the Service a mandatory duty to prohibit the hunting of any species whose population, for whatever reason, is declining." *Watt*, 551 F. Supp. at 1319 (contrasting purposes of ESA and MBTA, and noting that migratory game bird at issue in case was not ESA-listed).  Thus, the proper scale for determining irreparable harm absent an injunction under the MBTA is not at the individual bird level, but rather cormorants in the aggregate.  Thus, Plaintiffs' argument that an injunction is warranted because the individual cormorants killed in Year 1 of the Plan cannot be replaced must necessarily fail.

Even assuming that immediate colony- or population-scale impacts are a better measure of whether Plaintiffs will be irreparably harmed, *cf.* FEIS at 1-37 (MBTA requires "emphasis on

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 6

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

long-term population trend of the western population of DCCOs . . . .") (emphasis added), Plaintiffs still fail to make the requisite showing of likelihood of such harm.  Plaintiffs claim that the Cormorant Plan's 2015 "Year 1" actions will kill "a significant portion" of the cormorants within the both the East Sand Island colony and the western population, and that this is the "first step" toward decreasing the western cormorant population to a level that falls below the Plan's definition of "sustainable."[4]  Prelim. Inj. Mot. at 26.  However, what Plaintiffs fail to note is that the Year 1 actions, as outlined in Appendix E-3 to the FEIS, will have only a minimal effect on the overall abundance of the western population.  As Plaintiffs acknowledge, the FEIS predicts that the western cormorant population may fall below 41,660 individuals (*i.e.*, the "sustainable population" level, *see* FEIS at 1-37) "after implementing Phase I of the Management Plan."  Prelim. Inj. Mot. at 22 (citing FEIS at 4-31).  However, Phase I is four years in duration.  FEIS at 2-10.  After Year 1, absent an injunction, there will likely still be 57,975 cormorants in the western population and 22,353 remaining at East Sand Island.  *See* FEIS at 2-42, Table 2-9. Plaintiffs have not argued that the population will fall below "sustainable" levels as a result of Year 1 actions alone.  Indeed, any such assertion would be flatly contradicted by the record.

For the reasons discussed above, any alleged harm to cormorants on a colony- or population-scale basis arising from Year 1 actions is not irreparable.  Moreover, the FEIS expressly allows the Corps to reverse course after Year 1 should monitoring indicate that effects on the cormorant population are more than anticipated.  If Year 1 actions appear to have greater impacts to the East Sand Island colony and the western population than assumed, the Plan calls

---

[4] Plaintiffs do not challenge the Plan's definition of a "sustainable population" level for the western cormorant population.

for the Corps and FWS to respond swiftly via adaptive management protocols to avoid an unexpectedly severe outcome for cormorants. FEIS at 2-7 (under adaptive management, "[t]ake could decrease or cease if observed abundance of the western population is lower than one standard deviation below predicted abundance, as this could be an indication that the East Sand Island colony is acting as an immigration sink . . . ."). Indeed, if the western population appears to be lower than 52,158 cormorants after Year 1 (which is still over 10,000 birds above the sustainable population level), the Corps will adapt the Plan to afford greater protection against further declines. *See* FEIS at 2-36 and 2-42, Table 2-9.[5] Under these circumstances, there is no evidence that Year 1 actions alone will cause irreparable harm at the colony- or population-scale level.[6] Accordingly, a preliminary injunction to preserve the status quo is not warranted because it is likely – should Plaintiffs prosecute the case diligently – that the merits of their claims can be determined before Year 2 of the Plan is implemented in 2016.

Plaintiffs also claim irreparable harm to their aesthetic and emotional interests that include reduced opportunities to experience cormorants, Prelim. Inj. Mot. at 30 (citing Holmes Decl., ECF No. 23); feelings of sadness, *id.* (citing Greenwald Decl., ECF No. 21 at ¶ 9); feelings of distress over using tax dollars to kill cormorants, *id.* at 31 (citing Holmes Decl. ¶ 13); and diminished enjoyment of recreating in the Columbia River basin, *id.* (citing Greenwald Decl. ¶ 17). Plaintiffs fail to explain how those interests rise to the level of irreparable harm required by *Winter*, when, after Year 1, there will still be 22,353 cormorants at East Sand Island (not

---

[5] Plaintiffs repeatedly claim that the current western population of cormorants has dropped to less than 10% of its historic levels. *See* Prelim. Inj. Mot. at 22, 26. Plaintiffs provide no support for this assertion, and we can locate none.

[6] Plaintiffs do not dispute that double-crested cormorants "are rather committed to East Sand Island and the Columbia River Estuary." *See* FEIS at 3-5.

including those found elsewhere in the Columbia River estuary) and 57,975 cormorants in the western population.  This leaves substantial opportunities for Plaintiffs' members to experience, view and enjoy cormorants, and the Court will have sufficient time to resolve the merits of Plaintiffs' case before a second year of the Plan is implemented.  Furthermore, the possible harm to economic interests posed by one of Plaintiffs' declarants, *see* Fee Decl. (ECF No. 22), is entirely speculative.  It seems equally plausible that Year 1 actions may generate greater interest in the WCNC's mission and thus <u>increase</u> public support through volunteer efforts and financial donations for the WCNC.

None of the cases cited by Plaintiffs in their irreparable harm argument involve the issuance of an MBTA depredation permit to enable an agency to comply with its obligation to avoid jeopardizing ESA-listed species.  However, even if the Court were to find that such harm is *per se* irreparable (and it should not for the reasons discussed above), it does not tip the balance of equities sharply in Plaintiffs' favor.  *See* Part II, *infra*.

## II.    Plaintiffs Cannot Demonstrate that the Public Interest and the Balance of Equities Weigh in their Favor.

The public interest inquiry primarily addresses impact on non-parties rather than parties. *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  Although typically the balance of the equities and the public interest factors merge when the government is a party, the presence of intervenors with interests in the case can "make it appropriate to consider the factors separately."  *Id.* (citing *Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967 (9th Cir. 2013)).

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 9

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

Plaintiffs do not dispute that the Corps' preparation of the Cormorant Plan and its related EIS was undertaken pursuant to the Corps' goal of ensuring compliance with the Endangered Species Act. Congress has, by enacting the ESA, placed a thumb on the scales that weighs the public interest and the equities heavily in favor of the endangered species. *TVA*, 437 U.S. at 194 ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the <u>highest of priorities</u>, thereby adopting a policy which it described as 'institutionalized caution.'") (emphasis added); *compare N. Dakota v. United States*, 460 U.S. 300, 309 (1983) ("The protection of migratory birds has long been recognized as 'a national interest of <u>very nearly</u> the first magnitude.'" (emphasis added) (quoting *Missouri v. Holland*, 252 U.S. 416, 435 (1920)). When it comes to balancing protection of endangered species from extinction against protecting depredating, non-endangered migratory birds from a temporary reduction in abundance below "sustainable" levels, Congress has spoken: the plain intent of the ESA "was to halt and reverse the trend toward species extinction, <u>whatever the cost</u>." *TVA*, 437 U.S. at 184 (emphasis added); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir.1996) ("Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species.").

Colville does not doubt that the "hardships" articulated by Plaintiffs and their declarants are sincere, in the sense that they believe they will suffer emotional and aesthetic injuries from mere contemplation that their tax dollars are being used to kill cormorants; from fewer cormorants to view and enjoy; and from diminished recreational enjoyment due to the thought of dead birds. But, feeling sad and bothered that only about 22,000 cormorants will remain in the Columbia River estuary after 2015 (a few thousand less than at present) cannot outweigh the

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 10

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

command of the ESA to protect endangered and threatened species from extinction.  To balance the equities in favor of cormorants would ignore that endangered salmonids are to be given "the highest of priorities."  *See TVA*, 437 U.S. at 194.

Aesthetic and emotional interests stemming from environmental injury may tip the scale when compared to economic interests, *see Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001); however, they do not tip the scale in favor of Plaintiffs in this case because any balancing of the hardships must fall in favor of the endangered species,  *see Native Songbird Care & Conservation v. LaHood*, No. 13-CV-02265-JST, 2013 WL 3355657, at *13 n.3 (N.D. Cal. July 2, 2013) ("Harm to any species impacts people who care for wildlife . . . But in balancing public interests, it is appropriate to note that while the cliff swallow is protected under the MBTA, it is a common and well-distributed species that has not been listed as threatened or endangered by either the federal or state governments.").

Plaintiffs claim that the balance of equities cannot tip in favor of Federal Defendants, and by proxy, the endangered species, because the Federal Defendants have allegedly failed to explain to Plaintiffs' satisfaction how the Cormorant Plan "is likely to actually improve survival of juvenile salmon and steelhead" or "increase the productivity of listed adult salmon and steelhead."  Prelim. Inj. Mot. at 33.  Plaintiffs claim that without "access to information as to whether such survival improvements are real or illusory," this Court cannot balance the equities. *Id.* at 34.  That argument ignores the principle that mitigation of even speculative risks to public resources is a valid public interest—a principle that is given "great weight when the risk is imminent or the danger has begun."  *See Connaughton*, 752 F.3d at 766.  Here, the threat is imminent: cormorants at East Sand Island could consume upwards of 20 million salmonid smolts

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 11

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

in 2015, including ESA-listed salmonids that are at high risk for extinction. *See* FEIS at 3-48, 3-50, 3-63. It's common sense that when a species is at high risk for extinction, removing a significant source of mortality is imperative if that species is to survive and recover.

Nor can aesthetic interests outweigh Colville's right to harvest anadromous fish from the mainstem Columbia River and its tributaries. *See* Decl. of Randall Friedlander, ECF No. 36, ¶ 2. The Tribes' fishing right is protected by federal law. *See Antoine v. Washington*, 420 U.S. 194, 196 (1975) (Tribes' reserved "the right to hunt and fish in common with all other persons" on unallotted lands within the former North Half of the Reservation "shall not be taken away or in anywise abridged."); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981) ("preservation of the tribe's access to fishing grounds was one purpose for the creation of the Colville Reservation"). However, the Tribes' right to harvest fish from within the Colville Reservation, the North Half, and the Wenatshapam Fishery on Icicle Creek is meaningless if fish do not return in sufficient numbers to allow for actual harvest by Tribal members. Friedlander Decl. ¶ 8; *accord Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 679 (1979) (reservation of right to take fish is more than "merely the chance, shared with millions of other citizens, occasionally to dip their nets into the territorial waters.").

To that end, Colville has invested significant money and effort in restoring UCR steelhead populations and reintroducing spring Chinook to the Okanogan River, the most inland tributary of the mainstem Columbia accessible to anadromous fish. *Id*. ¶¶ 11, 12. It is uncontroverted that the cormorant colony at East Sand Island consumes millions of juvenile salmonids each year, averaging 6% of all juvenile Upper Columbia River (UCR) steelhead, FEIS at 3-51, and 4% of all juvenile UCR spring Chinook salmon (a population "considered to

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 12

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

be at a high risk of extinction),  FEIS at 3-47 to 3-48.  Cormorants also prey on non-ESA listed salmonids, including the Leavenworth Hatchery spring Chinook stock that currently comprise the sole source of spring Chinook harvest available to Colville at the Wenatshapam Fishery, *see* Friedlander Decl. ¶¶ 3, 7, and wild sockeye and hatchery-origin summer/fall Chinook that the Tribes harvest under their federally protected rights at the confluence of the Columbia and Okanogan Rivers, *id.* at Ex. A, p. 5; *see also* FEIS at 3-64, 3-65 at Table 3-7 (describing Colville ceremonial and subsistence fishery).

Colville's federally reserved rights to take fish from the Upper Columbia and its tributaries would be harmed if an injunction is granted because, without implementation of the Plan, cormorants nesting at East Sand Island will eat millions of UCR steelhead, spring Chinook, summer/fall Chinook and sockeye salmon smolts again this year.  Those smolts will never return to the Upper Columbia as adults to become available for Tribal harvest.  Those lost fish reduce the Tribes' guaranteed right to a share of the harvest and impair the viability of Colville's reserved fishing rights.  Under these circumstances, Plaintiffs' aesthetic harms cannot outweigh the Tribes' cultural and subsistence need for salmon and steelhead to return to the Reservation and other fishing locations and the harvest rights that ensure those needs are satisfied.  *See Mille Lacs Band of Chippewa Indians v. State of Minn.*, 864 F. Supp. 102, 105 (D. Minn. 1994) *aff'd sub nom. Mille Lacs Band v. Cnty. of Aitkin*, 66 F.3d 332 (8th Cir. 1995) (balancing harms in favor of tribe because "an injunction could prevent plaintiffs from exercising their treaty rights; this could constitute irreparable injury.") (citing *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1516 (W.D.Wash.1988)).

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 13

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

**III.    Plaintiffs Are Not Likely To Succeed On The Merits.**

Colville addresses only one of the key issues going to the merits that was raised by Plaintiffs' preliminary injunction motion; however, because Plaintiffs cannot show success on the other three *Winters* factors already discussed, there is no need for the court to address likelihood of success on the merits.  *See Vilsack*, 636 F.3d at 1174.

Plaintiffs assert that they are likely to succeed on the merits of their APA claim that the agencies "have failed to demonstrate a rational connection between killing thousands of birds and increasing returns of listed salmon spawners."  Prelim. Inj. Mot. at 9.   This alleged d arises from the Corps' supposed failure to link the Cormorant Plan to increases in adult productivity metrics.  This argument misses the mark for at least two reasons.

First, Plaintiffs mischaracterize (or misunderstand) the relevance of the "survival gap" analysis conducted by NMFS in the 2014 Supplemental Biological Opinion prepared for the operation of the Federal Columbia River Power System ("2014 FCRPS BiOp").  As stated by NMFS,

> One of the assumptions in our 2008 BiOp analysis was that specific rates of predation estimated for the Base Period would continue into the future. However, as noted in Section 2.2.4, this underestimated the predation rates by double-crested cormorants in the estuary, which increased substantially in numbers during 2003–2009. As a result, the productivity of interior Columbia basin steelhead populations is about 3.6% lower than assumed for the Current Period in the 2008 BiOp analysis, and that of interior Columbia basin stream-type spring- and summer-run Chinook salmon and ocean-type SR fall Chinook salmon is about 1.1% lower than assumed.

2014 FCRPS BiOp at 409 (Rohlf Decl., ECF No. 27, at 608).  The 2008 FCRPS BiOp, which was supplemented in 2010 and 2014, analyzed several population-level jeopardy metrics, as measured during the "Base Period," to determine whether the proposed FCRPS action

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 14

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

jeopardized listed salmonids as compared to the status of the listed ESUs during the Base Period. 2014 FCRPS BiOp at 46, 48 (ECF No. 27 at 245, 247).[7]  Because those Base Period indicator metrics formed the starting point to NMFS' quantitative analyses for listed salmonids in the 2008 BiOp, NMFS needed to determine "if this starting point has changed in a manner that would affect other parts of the 2008 BiOp's jeopardy analysis." *Id.* at 46.  Because some FCRPS management actions changed from the beginning of the Base Period (*i.e.*, the early 1980s) to the time when the 2008 BiOp was developed (*i.e.*, 2007), the 2008 BiOp applied a Base-to-Current survival adjustment to observed Base Period <u>productivity</u> to represent the life-cycle performance that would be expected to occur if the current management activities and <u>conditions of the environmental baseline</u> continued into the future.  2014 FCRPS BiOp at 183.

However, between 2007 and 2013, it became clear that in terms of cormorant predation rates, the conditions of the environmental baseline were not as assumed – predation rates and resulting impacts to salmonid productivity were likely much <u>greater</u> than the 2008 FCRPS BiOp assumed.  Thus, NMFS needed to adjust its underlying assumption and determine what level of cormorant predation is consistent with the Base Period productivity and how the action agencies could reduce cormorant predation to that level in order to achieve the same survival benefits assumed by the 2008 FCRPS BiOp.

---

[7] "[A]ll life-cycle metrics informing the jeopardy analysis are based on the observed performance of populations during a historical time period and an assumption that, unless something affecting the survival or reproduction of the population changes in the future, the future performance can be projected from the pattern of past performance. The historical period of empirical observations is referred to in the 2008 BiOp as the Base Period."  2014 FCRPS BiOp at 49.

The whole point of the modified RPA 46 is not to directly increase returns of adult spawners or overall productivity of ESA-listed ESUs, *cf.* Prelim. Inj. Mot. at 10-11, 13-14, but to ensure that salmonid consumption rates by cormorants under the 2014 FCRPS BiOp are reduced to the consumption rates estimated during the 2008 BiOp's Base Period, *see* 2014 FCRPS BiOp at 409, so as to result in "no net change in the 2008 BiOp's survival expectations related to cormorant predation," 2014 FCRPS BiOp at 468;[8] *see also* 2014 FCRPS BiOp App. E at E-3 ("The primary goal for addressing double-crested cormorant . . . smolt consumption in the 2013 BiOp is to determine the smolt survival 'gap' that has resulted from the dramatic increase in cormorant population and smolt consumption between the base and current years that was not captured in the 2008 BiOp analysis.").  In other words, the Cormorant Plan is needed to correct an assumption underlying survival estimates of the 2008 BiOp in order to ensure that those estimates remain valid under the 2014 FCRPS BiOp.

_____

[8] As explained by NMFS:

> The 2008 BiOp's quantitative analysis for interior Columbia basin species implicitly assumed that cormorant predation rates were, and would remain, unchanged from average predation rates during the 2008 BiOp's Base Period. Because new information indicates that cormorant predation rates have been higher (and therefore salmon and steelhead survival has been lower) than that occurring in the 2008 BiOp Base Period, Base-to-Current survival is lower than estimated in the 2008 BiOp for all populations of interior Columbia basin species. However, in response to this new information, modification of RPA Action 46 calls upon the Corps to implement management actions by 2018 that will reduce cormorant nesting pairs, such that predation is reduced to a level equivalent to that during the 2008 BiOp's Base Period. The improvement in survival associated with the modified RPA Action 46 is expected to balance the reduced estimate of environmental baseline survival, leading to no net change in the 2008 BiOp's survival expectations related to cormorant predation.

2014 FCRPS BiOp at 468.

Second, as at least one expert witness for the plaintiffs in the FCRPS BiOp case has acknowledged, compensatory mortality is simply not relevant in the analysis related to cormorants because of the nature of the problem that the survival gap analysis is meant to address:

> For cormorants, the agencies are seeking to reduce cormorant predation to a level consistent with their assumptions about Base Period cormorant predation because predation by this species increased significantly after the Base Period, but this increase was not taken into account in the assumptions used in the 2008 BiOp's analysis (which instead assumed that cormorant predation in the future would be at approximately the same level as in the Base Period). Under these circumstances, where the focus is on reducing a single source of predation—cormorants—to the level assumed for that source in the original analysis, it is reasonable to treat the level of compensatory mortality associated with that predation as being the same in the earlier time period (i.e., in the Base Period) as in a later time period (after the Base Period). <u>And it does not matter to the analysis whether the assumed level of compensatory mortality is 50% or 100%.</u>

Second Decl. of Frederick Olney ¶ 35 (filed in *NWF v. NMFS*, Case No. 3:01-cv-00640-SI (D. Or.) as ECF No. 2018) (emphasis added).[9]

Plaintiffs' arguments about compensatory mortality and the necessity of linking cormorant population reduction to increased adult returns assume that the Federal agencies are seeking to reduce the overall level of mortality that listed salmonids experience from all sources by reducing the mortality from a specific source: cormorants. On this matter, Plaintiffs' counsel should tread carefully, as their arguments appear to run counter to arguments they have made in the FCRPS BiOp case also pending before this Court. *See* Plaintiffs' Mot. for Summ. J. at 31 (*NWF v. NMFS*, Case No. 3:01-cv-00640-SI, ECF No. 1976) ("NOAA says the action agencies will need to develop a plan to reduce cormorant predation, not in any absolute terms, but only in

---

[9] Plaintiffs' counsel Daniel Rohlf should be well aware of Mr. Olney's opinions, as he is co-counsel for the plaintiffs in the FCRPS BiOp case.

order to return it to the level of NOAA's 2008 assumption."); NWF's Reply Mem. in Supp. of Mot. for Summ. J. at 23 n.19 (ECF No. 2016) (adopting supporting declarant's position that compensatory mortality does not apply to cormorant predation); Second Decl. of Frederick Olney at ¶ 50 (ECF No. 2018).[10]

Plaintiffs' counsel are well-aware that the point of the Cormorant Plan is not to increase adult returns *per se*, but to address an overlooked source of mortality that arose after the Base Period used in the FCRPS BiOp's analysis and restore cormorant-caused mortality to its Base Period level; it is meant to correct an assumption that impacts the environmental baseline used to evaluate the effects of the proposed action (*i.e.*, implementation of the RPA for ongoing FCRPS operations). 2014 FCRPS BiOp at § 2.2 p. 183 (ECF No. 27 at 382); 2014 FCRPS BiOp at 456

---

[10] Mr. Olney states it quite clearly:

> In the Cormorant Appendix to the 2014 BiOp, NOAA calculates that the effect of this increased predation is to create a survival gap between the assumptions about cormorant predation in the 2008 BiOp and what has actually occurred since then of 3.6% for steelhead populations, 1.1% for yearling Chinook, and less than 1% for sockeye. 2014 BiOp, App. E. at E-5 to E-6. In other words, steelhead survival during the Current Period was 3.6% lower and spring/summer Chinook survival was 1.1% lower, as compared to the Base Period, than the analysis in the 2008 BiOp assumed. In order to address this survival "gap," NOAA proposes to reduce cormorant predation from today's level by an amount sufficient to return cormorant predation levels to those of the Base Period, thereby bringing Current Period cormorant predation on salmon and steelhead in line with the assumptions in the 2008 BiOp analysis. As I have discussed above, see supra at ¶¶ 34-37, <u>the cormorant action in the RPA is not designed to increase overall salmon survival as compared to the Base Period (unlike the action to address tern predation), but to address an overlooked source of increased mortality from a single source that arose after the Base Period. It is not intended to achieve a net gain in salmon and steelhead survival, but to restore survival to levels NOAA (incorrectly) assumed in 2008.</u>

(emphasis added).

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION - 18

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230

("Additionally, survival from avian predation is expected to improve to match 2008 BiOp expectations as a result of the amended RPA Action 46 cormorant management action.").

Thus, Plaintiffs' central claim in this litigation is based on an incorrect reading of the FCRPS BiOp and implementation of the RPA through the Cormorant Plan.  The unavailability of this argument greatly undermines Plaintiffs' claims and discredits their request for a preliminary injunction.

## CONCLUSION

For all of the reasons above, Plaintiffs have failed to demonstrate they are entitled to the extraordinary relief represented by a preliminary injunction.  Colville respectfully requests that the motion be denied and that the Court establish a schedule for resolution of the merits.

Respectfully submitted this 6th day of May, 2015.

s/ Brian C. Gruber
Brian C. Gruber, WSBA # 32210
Beth Baldwin, WSBA # 46018
ZIONTZ CHESTNUT
2101 Fourth Avenue, Suite 1230
Seattle, Washington  98121
Tel. (206) 448-1230
Fax (206) 448-0962
bgruber@ziontzchestnut.com
bbaldwin@ziontzchestnut.com

*Attorneys for Confederated Tribes of the Colville Reservation*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties in this matter who are registered with the Court's CM/ECF filing system.

s/ Cara Hazzard
Legal Assistant

COLVILLE *AMICUS CURIAE* BRIEF IN SUPPORT
OF FEDERAL DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- CERTIFICATE OF SERVICE

ZIONTZ CHESTNUT
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230