# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **AUDUBON SOCIETY OF PORTLAND**, *et al.*, | Case No. 3:15-cv-665-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **UNITED STATES ARMY CORPS OF ENGINEERS**, *et al.*, | |
| Defendants. | |

Daniel J. Rohlf and Thomas Charles Buchele, EARTHRISE LAW CENTER, 10015 S.W. Terwilliger Boulevard, Portland, OR 97219-7768. Of Attorneys for Plaintiffs.

Billy J. Williams, United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204; John C. Cruden, Assistant Attorney General, Seth M. Barsky, Section Chief, and Bradley H. Oliphant, Trial Attorney, U.S. DEPARTMENT OF JUSTICE, Environment and Natural Resources Division, 999 18th Street, South Terrace, Suite 370, Denver, CO 80202; Stephen Finn, U.S. DEPARTMENT OF JUSTICE, Environment and Natural Resources Division, P.O. Box 7611, Washington, D.C. 20044. Of Attorneys for Defendants.

Beth S. Ginsberg and Jason T. Morgan, STOEL RIVES, LLP, 600 University Street, Suite 3600, Seattle, WA 98101. Of Attorneys for Intervenor-Defendant Northwest RiverPartners.

Brent H. Hall, CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION, DEPARTMENT OF JUSTICE, 46411 Timine Way, Pendleton, OR 97801. Of Attorneys for *Amicus Curiae* Confederated Tribes of the Umatilla Indian Reservation.

Thomas A. Zeilman, LAW OFFICES OF THOMAS ZEILMAN, 32 N. Third Street, Suite 310, P.O. Box 34, Yakima, WA 98907 Of Attorneys for *Amicus Curiae* Confederated Tribes and Bands of the Yakama Nation.

Josh Newton, KARNOPP PETERSEN LLP, 360 SW Bond Street, Suite 400, Bend, OR 97702. Of Attorneys for *Amicus Curiae* Confederated Tribes of the Warm Springs Reservation of Oregon.

Brian C. Gruber and Beth Baldwin, ZIONTZ CHESTNUT, 2101 Fourth Avenue, Suite 1230, Seattle, WA 98121. Of Attorneys for *Amicus Curiae* Confederated Tribes of the Colville Reservation.

**Michael H. Simon, District Judge.**

Plaintiffs Audubon Society of Portland, Wildlife Center of the North Coast, Animal Legal Defense Fund, Center for Biological Diversity, and Friends of Animals ("Plaintiffs") challenge the actions of Defendants U.S. Department of Agriculture Wildlife Services ("DWS"), U.S. Fish and Wildlife Service ("FWS"), and U.S. Army Corps of Engineers' ("Corps") (collectively, the "Federal Defendants") in preparing a Double-crested Cormorant ("DCCO") management plan, final environmental impact statement ("EIS"), and associated permits authorizing the "take," or killing, of DCCOs in the Columbia River estuary, specifically East Sand Island. Plaintiffs argue that Defendants' actions in preparing the DCCO final EIS, seeking the depredation permit, and granting the permit violate federal law, and that DWS's lethal removal of DCCO violate federal law.

Before the Court are cross motions for summary judgment filed by Plaintiffs, the Federal Defendants, and Intervenor-Defendant Northwest RiverPartners. In addition, the Confederated Tribes of the Colville Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, the Confederated Tribes of the Umatilla Indian Reservation, and the Confederated Tribes and Bands of the Yakama Nation, each with fishing rights secured by treaty, have appeared as *amici curiae* in opposition to Plaintiffs' motion and in support of the Federal Defendants' and RiverPartners' motions. For the reasons discussed below, Plaintiffs' motion for summary judgment is granted in part and denied in part, and the Federal Defendants' and RiverPartners' motions are granted in part and denied in part.

## BACKGROUND

**A. The Biological Opinions Relating to Endangered and Threatened Salmon and Steelhead**

The Columbia River is the fourth largest river on the North American continent. Every year, salmon and steelhead (collectively, "salmonids") travel up and down the Columbia River, hatch in fresh water, migrate as "juveniles" downstream to the Pacific on their way to adulthood, and later return upstream to spawn and die.[1] This is the natural course of Columbia River salmonids. They also must attempt to survive the Federal Columbia River Power System ("FCRPS"), which consists of hydroelectric dams, powerhouses, and associated reservoirs on the Columbia and Snake Rivers.

Over the last 25 years, thirteen species of Columbia and Snake River salmonids have been listed as endangered or threatened under the Endangered Species Act of 1973[2] ("ESA"). Because the FCRPS affects these species and their critical habitat, the National Marine Fisheries Service ("NMFS"), also known as "NOAA Fisheries," issues biological opinions (or "BiOps") relating to the operations of the FCRPS. The FCRPS BiOps were issued pursuant to Section 7 of the ESA, which requires that federal government "action agencies," in consultation with a federal government "consulting agency," conserve species listed under the ESA. Section 7 requires that government action may not jeopardize a listed species or adversely modify its critical habitat. NMFS, as the consulting agency, issued FCRPS BiOps in 1991, 1993, 1995, 2000, 2004, 2008, 2010, and 2014.

The 1993 BiOp concluded that the operations of the FCRPS would not jeopardize the listed species. The Idaho Department of Fish and Game challenged that opinion in a lawsuit

---

[1] All salmon and most steelhead die shortly after spawning.

[2] 16 U.S.C. §§ 1531 *et seq.*

brought in the United States District Court for the District of Oregon. The court granted summary judgment in favor of the plaintiff. The court ruled that the 1993 biological opinion was arbitrary and capricious because NMFS failed adequately to explain several of the critical assumptions supporting its jeopardy analysis and conclusion. This decision was vacated on appeal as moot because NMFS had issued the 1995 BiOp, which found that the FCRPS did, in fact, jeopardize the listed species.

The 2000 BiOp also was challenged in court. In May 2003, U.S. District Judge James A. Redden ruled that the 2000 BiOp was arbitrary and capricious because it relied on (1) federal mitigation actions that were not subject to the consultation process that is required under the ESA and (2) non-federal mitigation actions that were not shown to be reasonably certain to occur. Judge Redden ordered NMFS to issue a new biological opinion by 2004 that addressed and cured these deficiencies. Judge Redden continued to reject the federal government's 2004 and 2008 BiOps, and the 2010 Supplemental BiOp. Judge Redden ordered that a 2014 BiOp be prepared to address the deficiencies that he had found.

In the 2008 BiOp, NMFS included a reasonable and prudent alternative ("RPA") that called for the development of a DCCO management plan encompassing research, development of a conceptual management plan, and implementation of warranted actions in the estuary. This RPA, identified as "RPA 46," did not specifically call for killing any DCCOs or attribute any numerically precise survival improvement for salmonids from any required reduction in DCCOs.

A DCCO management group was formed to comply with RPA 46. During the group's research and development of a DCCO plan, an NMFS biologist noted that the 2008 BiOp had missed the significant DCCO population increase between 2000 and 2006, which resulted in a 2008 BiOp environmental baseline for salmonid survival that was too high. NMFS determined

that the unaccounted-for increase in DCCOs resulted in a "survival gap" for listed salmonids that needed to be addressed with actions that would improve salmonid productivity, including DCCO management objectives. NMFS calculated the "survival gap" to be 3.6 percent of steelhead and 1.1 percent of Chinook salmon. To respond to this salmonid "survival gap," the 2014 BiOp included a revised RPA 46 that called for reducing DCCO populations to their "Base Period" levels of no more than 5,380 to 5,939 nesting pairs, which NMFS determined would reduce DCCO consumption of juvenile salmonids to the level assumed in the 2008 BiOp. The 2014 BiOp concluded that the "survival gap" would be offset by making this reduction in DCCOs, which would reduce the consumption of juvenile salmonids and therefore increase salmonid productivity.

NMFS completed its 2014 BiOp, which found that the government action of operating the FCRPS jeopardized the listed species and adversely modified critical habitat. To avoid jeopardy and adverse modification of critical habitat, the 2014 BiOp included 73 RPAs, including the DCCO-related RPA 46. NMFS concluded that implementing these 73 RPAs would not jeopardize the listed species or adversely modify their critical habitat.

The 2014 BiOp was challenged in federal court as violating both the ESA and the National Environmental Policy Act of 1969[3] ("NEPA"). The Court granted the plaintiffs' motion for summary judgment in part, finding that the 2014 BiOp violated the ESA because NMFS failed properly to consider whether the government action jeopardized the listed species by: (1) applying an improper standard of review of what constitutes "jeopardy"; (2) relying on achieving 100 percent of numerically precise survival improvements from uncertain habitat mitigation measures with uncertain benefits; (3) relying on achieving specific benefits to the

---

[3] 42 U.S.C. §§ 4321 *et seq.*

listed species from management of Caspian terns; (4) failing properly to consider climate change; and (5) relying on achieving specific numerical benefits to the listed species from a kelt management program. *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, --- F. Supp. 3d. ---, 2016 WL 2353647 (D. Or. May 4, 2016) ("FCRPS BiOp Case"). Notably, the Court deferred to NMFS's determination that reducing DCCOs to the Base Period population level would reduce their predation on juvenile salmonids to the level that had been assumed in the 2008 BiOp in calculating the environmental baseline. *Id.* at *46. The Court also found that the Corps and the U.S. Bureau of Reclamation violated NEPA by failing to prepare an environmental impact statement assessing reasonable alternatives to the 73 RPAs. *Id.* at *55-65.

**B.  DCCO EIS and Take**

The Corps adopted the 2014 BiOp in a record of decision ("ROD"). After adopting the 2014 BiOp, the Corps issued a Draft EIS relating to DCCO management. The Draft EIS evaluated three alternatives to reduce DCCO predation on salmonids and a "no-action" alternative. The preferred alternative included a significant take of adult DCCO, totaling 18,185 over four years. After reviewing public comments, and specifically in response to concerns raised by FWS regarding the number of adult DCCOs that would be killed, the Corps added a fourth reduction alternative (alternative C-1) in the final EIS. The fourth reduction alternative incorporated the proposal by FWS and included less take of adult DCCOs and more oiling of eggs and destruction of nests. This plan calls for a four-year staged implementation of killing a total of 10,912 adult DCCOs and oiling and destroying a total of 26,096 nests. This alternative was the preferred option and was the alternative ultimately adopted by the Corps in its ROD.

After adopting the DCCO plan, the Corps then applied to FWS to permit lethal take of DCCOs. FWS was a cooperating agency in the development of the draft and final DCCO EIS, and an FWS biologist was one of the co-authors of the final EIS. In a ROD dated April 13, 2015,

PAGE 6 – OPINION AND ORDER

FWS adopted the DCCO final EIS and approved the Corps's permit application. FWS found that the Corps adequately demonstrated that DCCOs are responsible for predation on juvenile salmonids. Also on April 13, 2015, FWS issued the requested depredation permit. The depredation permit authorized a certain amount of lethal take of DCCOs and egg oiling, and must be renewed annually. A second permit was issued in 2016 for the DCCO take and egg oiling activities scheduled for 2016. Another permit must be issued in 2017 and 2018 for any future planned DCCO take and egg oiling.

Along with FWS, DWS also was a cooperating agency in the development of the draft EIS and final EIS. DWS adopted the DCCO final EIS in a ROD on May 21, 2015. DWS assists the Corps in implementing the take of DCCOs.

## DISCUSSION

The parties cross-move for summary judgment on Plaintiffs' claims. In their Second Amended Complaint, Plaintiffs' assert twelve claims.[4] Plaintiffs identify some claims as being brought under NEPA, some under the Administrative Procedures Act ("APA"),[5] some under the Water Resources Development Act[6] ("WRDA"), and some under the Migratory Bird Treaty Act[7]

---

[4] On September 25, 2015, Plaintiffs filed an unopposed motion (ECF 75) seeking leave to file their Second Amended Complaint, a proposed copy of which was attached to the motion, ECF 75-1. On September 30, 2015, the Court granted Plaintiffs' motion. ECF 76. Although Plaintiffs should have then filed their Second Amended Complaint, but did not, for purposes of the pending motions the Court considers ECF 75-1 to be Plaintiffs' operative Second Amended Complaint.

[5] 5 U.S.C. §§ 701 *et seq.*

[6] Plaintiffs challenge the Corps' actions as violating WRDA Section 511(c)(1), which states: "In conjunction with the Secretary of Commerce and the Secretary of the Interior, and consistent with a management plan to be developed by the United States Fish and Wildlife Service . . . [the Corps shall] carry out methods to reduce nesting populations of avian predators on dredge spoil islands in the Columbia River under the jurisdiction of the Secretary." WRDA, Pub.L. No. 106–53, 113 Stat. 269 (1999) (codified at 16 U.S.C. § 3301 note).

("MBTA"). Alleged violations of NEPA, the MBTA, and the WRDA are reviewed under the APA because the APA provides the authority for this Court to review the Federal Defendants' decisions and actions under those statutes. *See Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 585 (9th Cir. 2016) ("Through the APA's prohibition against unlawful agency action, a plaintiff may bring a civil suit to compel agency compliance with the MBTA."); *Oregon Nat. Desert Ass'n v. Jewell*, 823 F.3d 1258, 1263 (9th Cir. 2016) ("NEPA challenges are reviewed under the Administrative Procedure Act."); *Enos v. Marsh*, 769 F.2d 1363, 1375 (9th Cir. 1985) ("The WRDA does not establish a specific right to judicial review of agency action, and thus a plaintiff must seek review of a violation under the Administrative Procedure Act.").

Plaintiffs offer evidence and argument supporting only eight of the twelve claims asserted in Plaintiffs' Second Amended Complaint. Summary judgment is therefore granted against the four claims for which Plaintiffs did not offer any evidence or argument.[8] Plaintiffs' remaining eight claims are as follows:

- Claims One, Two, and Three, alleging that the Corps violated NEPA in preparing the DCCO EIS by: (1) failing properly to consider an appropriate range of reasonable alternatives; (2) improperly crafting an unreasonably narrow "purpose and need" statement in the EIS; and (3) failing properly to take the requisite "hard look" at the proposed action by considering the lack of benefits that killing DCCOs will provide to salmonids listed as threatened and endangered under the ESA.

- Claim Five, alleging that the Corps violated the APA, without citing to any statute or regulation. For the reasons discussed below, this claim is analyzed in conjunction with Plaintiffs' Third Claim for Relief under NEPA.

- Claim Six, alleging that the Corps violated the WRDA because the Corps's plan to take DCCOs, the DCCO final EIS, is outside of the Corps's statutory authority granted in the WRDA. Specifically, Plaintiffs argue that the WRDA only

---

[7] 16 U.S.C. §§ 703 *et seq.*

[8] Those claims are: (1) Claim Four, under NEPA; (2) Claim Eight, under the MBTA; (3) Claim Ten, under the MBTA; and (4) Claim Eleven, under the APA.

authorizes the Corps to reduce populations of avian predators, including DCCOs, pursuant to a management plan developed by FWS and that because FWS did not develop the DCCO final EIS or DCCO management plan, the plan is outside the authorization of the WRDA.

- Claim Seven, alleging that FWS violated the MBTA. Plaintiffs allege that FWS violated the MBTA because the total "take" of DCCOs reduces the population to a potentially unsustainable level and therefore potentially threatens DCCOs.

- Claim Nine, alleging under the APA that FWS acted arbitrarily and capriciously by violating the MBTA's implementing regulations in determining that the Corps demonstrated a valid justification for the take of DCCOs.

- Claim Twelve, alleging that FWS violated NEPA by failing to provide the Corps with information known to FWS that that reducing DCCOs would not improve salmonid productivity. Thus, allege Plaintiffs, FWS improperly relied on the Corps's DCCO final EIS when FWS knew that EIS was based on incomplete information.

The Court analyzes these claims below, based on the underlying statute that Plaintiffs allege was violated.

Plaintiffs argue that the Federal Defendants acted arbitrarily and capriciously in preparing the DCCO EIS, issuing the depredation permits, and conducting the DCCO culling program by ignoring relevant factors, reaching conclusions that are not rational based on the information known, and acting beyond their authority. The Federal Defendants, RiverPartners, and *amici* (collectively "Defendants") respond that the Federal Defendants acted within their authority and discretion and that their determinations are entitled to broad deference from the Court.

## A.  Judicial Review Under the Administrative Procedures Act

Under the APA, "an agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) *cert. denied sub nom. Stewart & Jasper Orchards v. Jewell*, 135 S. Ct. 948, 190 L. Ed. 2d 830 (2015), and *cert. denied sub nom. State Water Contractors v. Jewell*, 135 S. Ct. 950, 190 L. Ed. 2d 830 (2015) (quoting 5

U.S.C. § 706(2)(A)). A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quotation marks and citation omitted). The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.* (quotation marks and citation omitted). Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2007) (hereinafter "*NMFS*").

**B.  The Alleged Violations of NEPA**

**1.  Standards**

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[9] "NEPA requires that 'to the fullest extent possible . . . all agencies of the Federal Government shall' complete an environmental impact statement (EIS) in connection with 'every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.'" *San Luis & Delta-Mendota*, 747 F.3d at 640-41 (alteration in original) (quoting 42 U.S.C. § 4332(2)(C)). "In addition to the proposed agency action, every EIS must '[r]igorously explore and objectively evaluate all reasonable alternatives' to that action. 40 C.F.R. § 1502.14(a). The analysis of alternatives to the proposed action is 'the heart of the environmental impact statement.'" *Ctr. for Biological*

---

[9] The Council on Environmental Quality promulgates regulations implementing NEPA (40 CFR Parts 1500 – 1508) that are binding on federal agencies and are given substantial deference by courts. *See Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 789 n.3 (9th Cir. 2014) (finding that NEPA implementing regulations are given substantial deference by courts); *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1138 n.3 (9th Cir. 1998) (noting that NEPA regulations are binding on federal agencies).

*Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (second citation omitted). The purpose of NEPA is twofold: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

### 2. Biological opinions

Because the conduct of the Corps, FWS, and DWS at issue in this case originated in response to RPA 46 from the 2008 and 2014 BiOps, the Court provides a brief explanation of the biological opinion process. "The ESA imposes a procedural consultation duty whenever a federal action may affect an ESA-listed species. . . . the agency planning the action, usually known as the 'action agency,' must consult with the consulting agency" in a process "known as a 'Section 7' consultation." *NMFS*, 524 F.3d at 924. "After consultation, investigation, and analysis, the consulting agency then prepares a biological opinion." *Id.* "The biological opinion includes a summary of the information upon which the opinion is based, a discussion of the effects of the action on listed species or critical habitat, and the consulting agency's opinion on 'whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat . . . .'" *Id.* (quoting 50 C.F.R. § 402.14(h)(3)). "If the consulting agency concludes that an action agency's action may jeopardize the survival of species protected by the ESA, or adversely modify a species' critical habitat, the action must be modified. The consulting agency may recommend a 'reasonable and prudent alternative' to the agency's proposed action." *Id.* at 925 (quoting 16 U.S.C. § 1536(b)(3)(A)).

As relevant here, the federal action at issue in the FCRPS BiOp case is the operation of the FCRPS and the listed species are the listed salmonids. The Corps and another federal agency, the Bureau of Reclamation, are the two action agencies involved in operating the FCRPS. FWS is not an action agency or a consulting agency with respect to the FCRPS BiOp. RPA 46 is one of 73 RPAs recommended to avoid the jeopardy to listed salmonids from FCRPS operations.

### 3.   Failure to consider all reasonable alternatives

Plaintiffs' first claim under NEPA is that the Corps violated NEPA by failing to consider all reasonable alternatives. Specifically, Plaintiffs challenge the failure to consider any alternative other than methods of killing or hazing DCCOs, such as alternatives to hydropower operations or other measures to increase salmon productivity. Plaintiffs argue that the Federal Defendants engage in a "perfect circle of logic" under which alternatives to culling DCCOs will never be considered. Plaintiffs contend that by failing to complete an EIS at the biological opinion level that considers reasonable alternatives to the 73 RPAs (including alternatives to killing DCCOs), and then asserting in the DCCO EIS that such alternatives cannot be considered because the options are constrained by the 2014 BiOp, such alternatives never will be considered. Defendants respond that the Corps needed to follow NMFS's directive in the 2014 BiOp to reduce DCCOs and that the DCCO final EIS considered sufficient alternative ways to achieve that specific goal.

After the Court found in the FCRPS BiOp Case that the Corps and the Bureau of Reclamation, the action agencies for the 2014 BiOp, violated NEPA by adopting the 2014 BiOp without completing an EIS on the 73 RPA actions set forth in the 2014 BiOp, the Court sought supplemental briefing in this case on how that decision may affect the claims here. RiverPartners asserts that Plaintiffs' NEPA claims are now moot because Plaintiffs here seek an analysis of alternatives to culling DCCOs and the Court has now ordered in the FCRPS BiOp Case an EIS,

PAGE 12 – OPINION AND ORDER

which will include such analysis. *Amici* similarly argue that the "hard look" of alternatives to reducing DCCO will now be completed in the FCRPS BiOp Case and that the "perfect circle of logic" that Plaintiffs complain about here has been broken by that decision. *Amici* further argue that the Court's opinion in the FCRPS BiOp Case implies that the appropriate venue for such a NEPA analysis is in the FCRPS BiOp Case and not in this case, which involves only one of the 73 RPA actions.

On the other hand, the Federal Defendants argue that the Court's opinion in the FCRPS BiOp Case is irrelevant to the NEPA claims in this case because the Federal Defendants "would likely have prepared and implemented" the DCCO EIS under the authority granted in the WRDA, unrelated to the biological opinion process. Plaintiffs, however, argue that the Court's decision in the FCRPS BiOp Case is dispositive of the NEPA violation here and thus Plaintiffs should prevail in their claim that the Corps violated NEPA.

Plaintiffs' NEPA claim is not moot. The fact that a NEPA violation occurred at the biological opinion level and must be remedied at that level is not dispositive of whether one occurred when the DCCO final EIS was prepared. Further, Plaintiffs seek remedies in this case in addition to requiring a "hard look" at alternatives other than culling DCCOs, including an injunction stopping the remaining two years of the DCCO culling plan. Thus, the Court considers the merits of Plaintiffs' claim that the Corps violated NEPA by failing to consider all reasonable alternatives.

The Ninth Circuit's opinion in *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006), is instructive on this alleged NEPA violation. Although *'Ilio'ulaokalani* involved a situation where both a programmatic EIS and a separate site-specific EIS were prepared, and here no EIS was prepared at the biological opinion level, the underlying principles are the same.

At some point, the government must take the requisite "hard look" at all reasonable alternatives.

As explained by the Ninth Circuit:

> Without having considered alternatives to transformation of the 2nd Brigade in Hawaii in the PEIS, the Army had an obligation to consider such alternatives in the SEIS. The Army argues that the scope of reasonable alternatives to be considered in the SEIS was bound or limited by the PEIS's decision to transform in Hawaii as articulated in the SEIS purpose and need statement.
>
> The way the Army would have it, it was neither required to examine alternatives to transformation in Hawaii in the PEIS (because the site-specific threshold had not yet been crossed) nor in the SEIS (because on-site transformation of the 2nd brigade was mandated by the PEIS as articulated in the SEIS purpose and need statement). The Army can't have it both ways. Either it needed to explain in the PEIS its decision to transform the 2nd Brigade in Hawaii and consider reasonable alternatives in the PEIS or it needed to explain that decision in the SEIS, but the Army cannot simultaneously argue that the decision had been made in the PEIS and that it had not. Somewhere, the Army must undertake site-specific analysis, including consideration of reasonable alternatives.

'Ilio'ulaokalani, 464 F.3d at 1097.

The fact that the government failed to perform the required NEPA analysis at the biological opinion level does not necessarily mean that a NEPA analysis at the DCCO culling level (analogous to a site-specific level) is deficient. Had the DCCO final EIS considered reasonable alternatives of actions other than culling DCCOs as called for in the 2014 BiOp, it may have had a sufficient NEPA analysis and not violated NEPA, despite the NEPA violation that occurred when the 2014 BiOp was adopted. *See id.* (noting that when the proper analysis is not done at the programmatic EIS level it must be done at the site-specific level). But the DCCO draft and final EISs do not contain such an analysis.

Properly analyzing alternative actions is the "heart" of an EIS. *Id.* at 1095. "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the

'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); *see also Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) (noting that the "touchstone" of NEPA's alternatives analysis is whether the EIS's "selection and discussion of alternatives fosters informed decision-making and informed public participation"). Accordingly, the Corps and FWS violated NEPA by failing to consider reasonable alternatives other than culling DCCOs.

The Court also does not find persuasive the Federal Defendants' assertion that the DCCO EIS necessarily would have been prepared even without the FCRPS BiOps. The Corps's ROD adopting the DCCO final EIS states:

> MANAGEMENT PLAN PURPOSE AND NEED: RPA Action 46 calls for a reduction in DCCO predation of juvenile salmonids over 172 river miles of the Columbia River Estuary by reducing the East Sand Island colony, which accounts for 98 percent of the DCCO breeding population in the Columbia River Estuary. A specific management objective of no more than 5,380-5,939 breeding pairs on East Sand Island was ***identified in the 2014 Supplemental FCRPS Biological Opinion. In the FEIS, the Corps adopted this objective*** and the analysis provided by NOAA Fisheries to support the purpose and need for the action.

> DEVELOPMENT OF THE MANAGEMENT PLAN: ***In response to the 2008 FCRPS Biological Opinion*** which required development of a DCCO management plan, the Corps formed a DCCO interagency working group. The working group developed conceptual alternatives based on various percent reductions of the colony size and prepared a status assessment for the western population of DCCO. . . .

> * * *

> ALTERNATIVES CONSIDERED IN REACHING THE DECISION: Several alternatives were suggested during scoping and in public comments received on the DEIS. All comments were

considered and some comments prompted further refinement of the alternatives. After further consideration, ***those alternatives that would not meet the purpose and need to address RPA Action 46 were eliminated from detailed study.***

ACE_DCCO_0000001-2 (emphasis added). In addition, the DCCO final EIS states:

> Development and implementation of a management plan to reduce avian predation is a ***requirement*** from the Corps's consultation under the Endangered Species Act with the National Marine Fisheries Service of the National Oceanic and Atmospheric Administration (NOAA Fisheries) for the operation of the hydropower dams that make up the Federal Columbia River Power System. ***The proposed management plan in this Final Environmental Impact Statement was developed to comply with reasonable and prudent alternative action 46 in the 2008 and associated 2010 and 2014 Supplements to the Federal Columbia River Power System Biological Opinion issued by NOAA Fisheries.***

ACE_DCCO_0000112 (emphasis added).

Further, in responding to public concerns that alternatives other than culling DCCOs should have been considered, the Corps responded:

> The call for DCCO management ***results from the NOAA Fisheries issued Biological Opinion and supplemental Opinions (NOAA 2010, NOAA 2014), including RPA action 46***, which is specific to DCCO management and includes a prescriptive target level to be achieved and timeline to follow to reduce DCCO predation to "base levels" within the context of the Federal Columbia River Power System Biological Opinion's jeopardy opinion. ***Thus, alternative courses of action would not achieve the specific objective of RPA action 46*** (reducing DCCO predation), and these other courses of actions are more relevantly addressed in other RPA actions, such as those specific to dam operations, habitat, harvest, and hatcheries.

ACE_DCCO_0000813 (emphasis added). The Corps further responded that:

> the [draft] EIS defined the purpose and need for the proposed action and developed a range of alternative[s] to meet that purpose and need. ***The purpose and need was specific to implementing RPA action 46 in the Federal Columbia River Power System Biological Opinion.*** That RPA, action 46, concerns reducing DCCO predation of ESA-listed juvenile salmonids in the Columbia

River Estuary. Accordingly, the range of reasonable alternatives includes those alternatives that might meet RPA action 46.

ACE_DCCO_0000837 (emphasis added).

FWS's ROD issuing the depredation permit to the Corps also provides in the "background" section that:

> **The Corps developed the Double-crested Cormorant Management Plan and FEIS to comply with reasonable and prudent alternative action (RPA) 46 in the 2008 FCRPS Biological Opinion (BiOp)**, and its 2010 and 2014 Supplements, issued by NOAA Fisheries, which identified a management objective [of] no more than 5,380-5,939 breeding pairs of Double-crested Cormorants on East Sand Island (2014 Supplemental FCRPS BiOp).
>
> The Corps selected Alternative C-1 from the FEIS to meet RPA 46 based on feasibility, minimizing impacts to the western population of Double-crested Cormorants and other species, and minimizing the potential for Double-crested Cormorant dispersal which could affect States, local agencies, and the public.

FWS_00001577-78 (emphasis added).

Throughout the development of the DCCO management plan, draft EIS, and final EIS, the Corps consistently asserted that culling of DCCOs is necessary *because* of the FCRPS BiOp process and requirements. In briefing both the preliminary injunction motion and the pending motions for summary judgment, the Federal Defendants took the position that the DCCO plan was required because of the 2008 and 2014 BiOps. Although the Federal Defendants have consistently noted that they *have authority* under the WRDA to cull DCCOs, they did not previously take the position that the DCCO plan and final EIS were prepared *because of* the general authority granted in the WRDA (rather than the BiOp process), and they only made that assertion after the Court held in the FCRPS BiOp Case that adopting the 2014 BiOp without preparing a proper NEPA analysis was a violation of NEPA. Accordingly, Plaintiffs' motion for

summary judgment is granted on Claim One and Defendants' cross motions for summary

judgment are denied.

### 4.   Narrow purpose and need statement

Plaintiffs' Second Claim for Relief asserts that the Corps violated NEPA by constructing

an unreasonably narrow statement of purpose and need. Plaintiffs argue that the purpose and

need statement was unreasonably narrow in two respects. First, Plaintiffs argue the purpose and

need was impermissibly focused on achieving a reduction in DCCOs consistent with RPA 46,

which led to a failure to consider all reasonable alternatives. Second, Plaintiffs argue that the

purpose and need statement was impermissibly focused on improving juvenile survival of

salmonids when the real purpose of the 2008 and 2014 BiOps' RPAs is to increase adult

salmonid survival. Defendants respond that the agencies are entitled to significant deference in

crafting their purpose and need statement.

Plaintiffs' first argument, that the Corps violated NEPA by crafting a narrow purpose and

need statement focused on achieving RPA 46 and thus preventing full consideration of

reasonable alternatives is foreclosed by the Ninth Circuit's opinion in *'Ilio'ulaokalani*. In

*'Ilio'ulaokalani*, the U.S. Army had made a decision to re-work the U.S. Army in three phases,

with phase two including, among other sites, transforming a unit located in Hawaii. *Id.* at 1087-

89. The U.S. Army had completed a programmatic EIS ("PEIS") that had identified the locations

being transformed, including the unit in Hawaii, but the PEIS had not provided an analysis of

reasonable alternatives of choosing units in other locations, such as a unit outside of Hawaii

instead of the unit in Hawaii. *Id.* at 1089-90. The Army then prepared a site-specific EIS

("SEIS") for the unit transformation in Hawaii. *Id.* at 1090. The SEIS had a narrow purpose and

need statement, designed to comply with the transformation of the unit as "mandated" in the

PEIS. *Id.* at 1090, 1097. The plaintiffs argued that the purpose and need statement in the SEIS

PAGE 18 – OPINION AND ORDER

was impermissibly narrow because it necessarily required action taken in Hawaii. The Ninth

Circuit rejected that argument, finding that the problem was not an impermissibly narrow

purpose and need statement, but rather a failure to consider alternate ways to achieve the mission

(transforming the Army) by assessing reasonable alternative unit locations (such as units outside

of Hawaii) in either the PEIS or the SEIS. *Id.* at 1097-98 and n.5. Similarly, the Court does not

find the problem here to be one of an impermissibly narrow purpose and need statement. As

discussed above, the Court finds the problem to be one of an inadequate assessment of

alternatives.

The Court also does not find persuasive Plaintiffs' second argument, that the Corps acted

arbitrarily and capriciously by impermissibly shifting focus from adult salmonid survival to

juvenile salmonid survival. As correctly pointed out by Defendants, courts "accord the agency

'considerable discretion to define a project's purpose and need' and review such statements for

reasonableness." *Protect Our Cmtys.*, 825 F.3d at 579 (quoting *Alaska Survival v. Surface

Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013))). A statement of purpose and need, however,

"will fail if it unreasonably narrows the agency's consideration of alternatives so that the

outcome is preordained." *Id.* (quotation marks omitted).

RPA 46 in the 2014 BiOp required that the Corps develop a DCCO management plan

that reduced DCCO predation in the estuary. DCCOs prey in the estuary on juvenile, not adult,

salmonids. The Corps drafted a purpose and need statement that aligned with the goals of

RPA 46. Plaintiffs argue that the Corps knew that the ultimate goal of all RPA actions was to

increase adult salmonid survival and knew that reducing DCCO consumption of juveniles would

not result in significant improvement of adult salmonid survival. The Corps, however, was

following the analysis of NMFS that reducing DCCO consumption of juvenile salmonids would

increase adult salmonid survival. Many of the RPA actions set forth in the 2014 BiOp focus only on juvenile salmonid survival. For example, RPA 5 focuses on minimizing juvenile travel time to increase juvenile survival, RPAs 18 through 25 include strategies for operations at each dam to improve juvenile survival through each dam, RPA 29 focuses on spill operations to improve juvenile survival, and RPA 30 focuses on transportation efforts to improve juvenile survival. It is not irrational to focus different RPA actions on increasing survival at different life stages. Moreover, the Court has already found that it was not arbitrary and capricious for NMFS to determine that reducing the number of DCCOs to Base Period levels would reduce the consumption of juvenile salmonids and the correlating change in adult survival, whatever it may be, to the assumed Base Period levels. *See Nat'l Wildlife Fed.*, 2016 WL 2353647 at *46.

Notably, NMFS's directive in RPA 46 to reduce DCCOs to Base Period levels was rendered in the context of a biological opinion that had found that operations of the FCRPS jeopardized the listed salmonids, and that each RPA action was necessary to avoid jeopardy. In such a context, biological opinions have "a powerful coercive effect on the action agency." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Although "an action agency is technically free to disregard" a biological opinion, it does so "at its own peril . . . ." *San Luis & Delta-Mendota*, 747 F.3d at 643 (quoting *Bennett*, 520 U.S. at 170). The Corps followed the recommendation of NMFS to reduce DCCOs. Under the circumstances of this case and in light of the significant deference given to agencies in drafting statements of purpose of need, the Court does not find that the Corps acted arbitrarily or capriciously in issuing a purpose and need statement that focused on juvenile survival of salmonids. Plaintiffs' motion for summary judgment is denied on Claim Two, and Defendants' cross motions for summary judgment are granted.

5.    **Purported benefits to endangered and threatened salmonids**

Plaintiffs' Third Claim for Relief is that the Corps violated NEPA by failing properly to

analyze the benefit to salmonid productivity, meaning the numbers of adult salmon and steelhead

that return to spawn, from killing DCCOs. Plaintiffs also raise this same underlying allegedly

arbitrary and capricious conduct in Claim Five, their "generic" APA claim against the Corps, and

in Claim Twelve, alleging that FWS violated NEPA.

In its role as a "consulting agency" under Section 7 of the ESA, NMFS determined that

reducing the DCCO population to the Base Period level would eliminate the 3.6 (steelhead)

and 1.1 (Chinook salmon) percent survival gap. This survival gap was calculated assuming zero

compensatory mortality. Compensatory mortality is the concept that describes the assumption

that salmonids eaten by DCCOs would have died from some other cause if not eaten by DCCOs

and thus would not have returned to spawn, even if no DCCOs were present in the estuary.

Plaintiffs argue that due to compensatory mortality, NMFS's conclusion, followed by the

Corps and FWS, that the unaccounted-for increase in DCCO population created a large survival

gap is not supportable. Plaintiffs assert that killing ten thousand DCCOs and oiling and

destroying tens of thousands of nests will only provide a minimal survival benefit to adult

salmonids. Plaintiffs further argue that scientists within the Corps and FWS knew that there was

likely minimal survival improvement to be gained from the DCCO plan and that the Corps and

FWS ignored or suppressed that information.

Plaintiffs' argument is essentially that because compensatory mortality was ignored by

NMFS in calculating the survival gap, the increase in DCCOs did not actually create much, if

any, of a survival gap. Therefore, argue Plaintiffs, killing DCCOs is unnecessary because it is

solving a survival gap that does not really exist. Plaintiffs assert that the Corps and FWS knew

this information, and thus it was arbitrary and capricious for the Corps and FWS to move

forward with the DCCO management plan.

When a biological opinion is issued by the consulting agency and adopted through an

ROD by an action agency, persons may challenge the analyses and conclusions contained in the

biological opinion by suing the consulting agency, or challenge the adoption and implementation

of the biological opinion by suing the action agency. Such challenges are brought under the

APA, asserting violations of Section 7 of the ESA in the issuance or implementation of the

biological opinion. *See, e.g.*, *San Luis & Delta-Mendota*, 747 F.3d at 592. Thus, Plaintiffs could

have challenged NMFS's conclusions that the 3.6 and 1.1 percent survival gap existed because of

the increase in DCCOs. Plaintiffs also could have challenged the adoption and implementation

by the Corps of the 2014 BiOp and its underlying analyses that the survival gap was caused by

the increase in DCCOs by bringing a claim asserting violations of Section 7 of the ESA. As

Defendants point out, however, Plaintiffs chose not to bring such a claim. Instead, argue

Defendants, Plaintiffs are trying to take the substance of a claim alleging violations of Section 7

of the ESA and raise it under NEPA or generically under the APA.

In response to Defendants' arguments that Plaintiffs are inappropriately attempting to

cabin allegations of an ESA Section 7 violation into a NEPA claim or a "generic" APA claim,

Plaintiffs cite to *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410 (9th

Cir. 1990), and *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300 (9th Cir. 1993), *as amended on denial*

*of reh'g* (July 5, 1994). Plaintiffs rely on these cases to argue that an action agency (here, the

Corps) cannot blindly follow the conclusions of the consulting agency (here, NMFS) in a

biological opinion and that such reliance can be found to be arbitrary and capricious, particularly

if there is new information known to the action agency. Plaintiffs argue that, here, the Corps and

FWS knew a significant amount of new information about how little benefit to salmonid productivity would result from the DCCO management plan, which was withheld from or otherwise unknown by NMFS. The holdings of these cases cited by Plaintiffs, however, arise in the context of challenges alleging violations of Section 7 of the ESA, not NEPA or a "generic" APA claim. *See Pyramid Lake*, 898 F.2d at 1415 ("Each agency contemplating an action likely to affect a listed species must first confer with either the FWS or the National Marine Fisheries Service ('NMFS') before taking the action. . . . However, while consultation with the FWS may have satisfied the Navy's *procedural* obligations under the ESA, the Navy may not rely solely on a FWS biological opinion to establish conclusively its compliance with its *substantive* obligations under Section 7(a)(2)." (emphasis in original)); *Res. Ltd.*, 35 F.3d at 1304 ("Consulting with the FWS [consulting agency] alone does not satisfy an [action] agency's duty under the Endangered Species Act. An agency cannot 'abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious. . . . We have stated that 'even when the FWS's opinion is based on admittedly weak information, another agency's reliance on that opinion will satisfy its obligations under the Act if a challenging party can point to no new information—i.e., information the [FWS] did not take into account—which challenges the opinion's conclusions.'" (last alteration in original) (quoting *Pyramid Lake*, 898 F.2d at 1415) (citation omitted)).

The Court agrees with Defendants that the heart of Plaintiffs' argument is that the Corps knew information that NMFS did not know, and yet the Corps adopted the 2014 BiOp's conclusions relating to DCCOs anyway. This argument is a challenge to the Corps's adoption of the 2014 BiOp and should have been made alleging a violation of Section 7 of the ESA. Although DCCOs are not listed under the ESA, Plaintiffs' argument is that the benefit to the

listed salmonid species in killing DCCOs will not materialize, and that is an ESA Section 7

challenge. The Court is not persuaded that this type of challenge is appropriate as a NEPA claim

or a standalone APA claim.[10]

Regarding Plaintiffs' Twelfth Claim for Relief, alleging that FWS violated NEPA,

because FWS is not an action or consulting agency for purposes of the 2014 BiOp, it is not

subject to a challenge alleging violations of Section 7 of the ESA. The Court, however, does not

find that FWS acted arbitrarily or capriciously in adopting the Corps's DCCO EIS without a

more robust discussion of compensatory mortality or without disclosing the draft analysis of one

of its scientists for two reasons.

First, NEPA requires only that agencies make informed, not necessarily wise, decisions,

and that the public also be informed. *See Ala. Wilderness League v. Jewell*, 788 F.3d 1212, 1230

(9th Cir. 2015) ("NEPA achieves these broad goals by 'merely prohibit[ing] uninformed—rather

than unwise—agency action.'" (alterations in original) (quoting *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 351 (1989))). The issue of compensatory mortality was raised

and responded to during the Corps's NEPA process, and is discussed in the DCCO final EIS.

---

[10] The Court does not reach whether Plaintiffs' alleged standalone violation of the APA in Claim Five (without reference to any statute or regulation) is appropriate, because even if it were, the Court does not find it to be appropriate under the circumstances of this case. Whatever label Plaintiffs choose to put on Claim Five, the Court finds the essence of Plaintiffs' claim to be one alleging a violation of Section 7 of the ESA. Additionally, for the same reasons the Court rejected the Federal Defendants' argument that the DCCO final EIS would have been issued pursuant to the WRDA without the 2014 BiOp, the Court does not find persuasive Plaintiffs' new argument raised at the hearing that Claim Five means to raise a claim that the Corps violated the WRDA by issuing its DCCO final EIS without properly considering compensatory mortality and the benefit to adult salmonid survival of killing DCCOs. Plaintiffs' counsel referenced the Federal Defendants' assertion that the DCCO final EIS would have been issued under the WRDA without the BiOp process. The Court, however, was not persuaded by this assertion by the Federal Defendants. The Court instead found that the DCCO final EIS was issued because of the FCRPS BiOp process, not under the WRDA. Thus, Plaintiffs' challenge that the Corps knew information that NMFS did not know and yet still moved forward following NMFS's directive is one more appropriately brought alleging a violation of Section 7 of the ESA.

Second, although Plaintiffs point to a preliminary analysis by an FWS scientist finding DCCO consumption of juvenile salmonids to be fully compensatory, the record as a whole shows that the science is uncertain regarding the precise effect of compensatory morality on DCCO predation of salmonids. The analysis relied on by Plaintiffs was an internal draft analysis that had not yet been finalized or undergone peer review or other study. There are final studies in the record concluding that DCCO predation on juvenile salmonids is neither fully additive (no compensatory mortality) nor fully compensatory (100 percent compensatory mortality). *See, e.g.*, ACE-DCCO_0016391, DANIEL D. LYONS, ET. AL., BENEFITS TO COLUMBIA RIVER ANADROMOUS SALMONIDS FROM POTENTIAL REDUCTIONS IN PREDATION BY DOUBLE-CRESTED CORMORANTS NESTING AT THE EAST SAND ISLAND COLONY IN THE COLUMBIA RIVER ESTUARY, FINAL REPORT, dated February 17, 2014, at ACE-DCCO_0016411 (noting that the degree of "additive versus compensatory mortality is currently unknown" and that there was strong evidence "that indicates smolt mortality from avian predation is neither completely additive nor completely compensatory"). "When, as in this case, the agency 'is making predictions, within its area of special expertise, at the frontiers of science . . . a reviewing court must generally be at its most deferential.'" *Nat. Res. Def. Council v. U.S. E.P.A.*, 735 F.3d 873, 877 (9th Cir. 2013) (alteration in original) (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)). Based on the information in the record, FWS's adoption of the Corps's NEPA documents was not irrational, arbitrary, or capricious.

Accordingly, Plaintiffs' summary judgment motion is denied on Claims Three, Five, and Twelve, and Defendants' cross-motions for summary judgment are granted against those claims.

### 6. NEPA Remedy

Because the Court finds a violation of NEPA, the Court must consider the appropriate remedy. Plaintiffs argue that the Court should vacate the DCCO final EIS, the RODs adopting

PAGE 25 – OPINION AND ORDER

the final EIS, and enjoin the issuance of any more depredation permits authorizing the lethal take of DCCOs. Defendants respond that the DCCO management plan provides a benefit to salmonids that are listed as endangered or threatened under the ESA, that the Court in the FCRPS BiOp Case has already deferred to NMFS's conclusion that reducing DCCOs to their Base Period population would reduce DCCO predation on juvenile salmonids to the assumed baseline level, and that the Court in the FCRPS BiOp Case already has ordered that the 73 RPAs in the 2014 BiOp, including RPA 46 calling for the reduction in DCCOs, are to continue to be funded and implemented. Thus, argue Defendants, the Court should not disturb the DCCO plan and its implementation. Plaintiffs reply that the record evidence in this case, unlike in the FCRPS BiOp Case, shows that the benefit to salmonid productivity from reducing DCCOs is highly uncertain and likely minimal.

When a court determines that an agency's decision was unlawful under the APA, vacatur is the typical remedy. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court *shall … set aside* agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" (emphasis added)); *see also Ala. Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action."), *rev'd on other grounds sub nom. Coeur Alaska v. Bonneville Power Admin.*, 557 U.S. 261 (2009); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid."); *Reed v. Salazar*, 744 F. Supp. 2d 98, 119 (D.D.C. 2010) (noting that the "default remedy" is to set aside agency action taken in violation of NEPA).

Although the Supreme Court has cautioned courts against granting injunctive relief as a matter of course in NEPA cases, it did not question the use of vacatur as an appropriate remedy. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) (urging courts to employ partial or complete vacatur before considering the "drastic and extraordinary" relief of injunction); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) ("While the U.S. Supreme Court made clear in *Monsanto* that there is no presumption to other injunctive relief, . . . both the Supreme Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA." (citation omitted)).

Vacatur, however, is not required. *Cal. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. July 26, 2012) (per curiam). When equity demands, a court may elect not to vacate an illegal agency decision on remand. *See Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("In rare circumstances, when we deem it advisable that the agency action remain in force until the action can be reconsidered or replaced, we will remand without vacating the agency's action."); *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury.").

To determine whether vacatur would be appropriate in a given case, the Ninth Circuit has adopted the standard described in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993). Under the *Allied-Signal* standard, "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (quoting *Allied-Signal*, 988 F.2d at 150-51). Thus, courts may decline to vacate agency decisions

when vacatur would cause serious and irremediable harms that outweigh the magnitude of the agency's error.

Here, the failure to consider reasonable alternatives is a significant procedural error. Consideration of alternatives is the "heart" of NEPA. *'Ilio'ulaokalani*, 464 F.3d at 1095. The disruptive consequences of vacatur, however, outweigh the procedural error. Many of the considerations that the Court relied on in the 2014 BiOp Case in declining to vacate the 2014 BiOp and in leaving in place the 73 RPAs that offer some benefit to listed salmonids are applicable in this case.

As discussed above, the science indicates that DCCO consumption of listed salmonids is neither fully compensatory nor fully additive. Thus, although the survival gap caused by the increase in DCCOs is likely not as high as 3.6 and 1.1 percent, it is not zero. This means that at least some of the many millions of juvenile salmonids eaten each year by DCCOs would return to spawn if the DCCO population were reduced.

Although there is doubt about how much benefit to salmonid survival reducing the DCCO population will provide, the scientific evidence shows that it will provide some benefit to the productivity of salmonids currently listed as endangered or threatened under the ESA. In considering effects on endangered and threatened species, the "benefit of the doubt" must go to the endangered species. *Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987), *abrogation on other grounds recognized by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). As noted by the U.S. Supreme Court, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). DCCOs are not

listed as endangered or threatened, but many of the salmonids they consume are. Thus, the Court

follows the mandate of Congress and gives the endangered and threatened salmonids the highest

priority and the benefit of the doubt regarding the effects of DCCO predation.

Accordingly, the Court leaves in place the current DCCO management plan and final

EIS. Before any new DCCO management plan is developed, the Corps and FWS must comply

with NEPA by ensuring that, at some level, alternatives other than reducing DCCOs are

considered. This will likely be in the EIS prepared in the FCRPS BiOp Case, but if it is not, then

the analogous "site-specific" EIS relating to DCCOs must contain such an analysis.[11]

## C.  The Alleged Violations of the MBTA

The MBTA prohibits any person from killing any migratory bird included in the terms of

certain treaties between the United States and certain other countries. 16 U.S.C. § 703(a).[12] The

---

[11] The Court is aware that the DCCOs that are killed during the next two years cannot be brought back to life if the future proper NEPA analysis results in a determination that killing DCCOs does not provide a significant enough benefit to salmonids to keep a reduction of the DCCO population on East Sand Island as a part of the biological opinion process going forward. The salmonids that are eaten by the DCCOs over the next two years, however, also cannot be brought back to life if the future NEPA process determines that keeping a low DCCO population is beneficial to salmonids. Because there is doubt regarding which conclusion a compliant NEPA process ultimately will reach, the benefit of that doubt must be given to the salmonids, which are listed under the ESA.

[12] Under 16 U.S.C. § 703(a): "Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972, and the convention between the United States and the Union of Soviet Socialist

Secretary of the Interior, acting through FWS, may, however, permit the killing of these

migratory birds under certain circumstances. As relevant here, FWS may issue a permit "for

depredation control purposes" upon receiving an application that specifies, among other things,

the "nature of the crops or other interests being injured," and "the extent of such injury." 50

C.F.R. §§ 21.41(a), (b)(2), (3). A permit may not be issued, however, if "[t]he authorization

requested potentially threatens a wildlife or plant population . . . ." 50 C.F.R. § 13.21(b)(4).

There is no dispute that DCCOs are migratory birds subject to the MBTA. Plaintiffs

allege in their Seventh Claim for Relief that FWS violated the MBTA because the total number

of DCCOs that will be killed and prevented from hatching will potentially threaten the western

DCCO population by reducing it below sustainable levels. Plaintiffs also assert in their Ninth

Claim for Relief that FWS violated the MBTA because FWS failed properly to consider the

limited survival benefits killing DCCOs will provide to salmonids.

Upon receiving the Corps's 2015 application for a depredation permit, the FWS

undertook a four-stage process to determine whether the Corps had met all the regulatory

criteria. FWS_00001581-82. First, FWS determined that the Corps was appropriately seeking a

depredation permit because DCCOs from East Sand Island continue to prey on juvenile

salmonids, millions of which are listed as endangered or threatened under the ESA.

FWS_0001590-92. Second, FWS determined the Corps's application was complete and there

were no disqualifying factors. FWS_00001591. Next, FWS examined the application "in detail"

to ensure "there was a valid justification and showing of responsibility for the permit request."

FWS_00001582; 1592-96. In this review, FWS considered the high predation rate on juvenile

salmonids by DCCOs. Finally, FWS undertook its expert biological review of the application to

---

Republics for the conservation of migratory birds and their environments concluded
November 19, 1976."

ensure that issuance of the requested permit would "not potentially threaten a wildlife or plant population." FWS_00001596-98.

Neither the MBTA nor its regulations define "potentially threaten." FWS has interpreted it to mean that the proposed culling would cause DCCOs not to be "sustainable." FWS_00001596. FWS adopted the definition of "sustainable" from the DCCO final EIS: "a population that is able to maintain a long-term trend with numbers above a level that would not result in a major decline or cause a species to be threatened or endangered." *Id.* The Court applies *Auer* deference to an agency's interpretation of its own ambiguous regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143, 1150 (9th Cir. 2015) ("An agency's interpretation of its own regulations is entitled to judicial deference unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" (quoting *Auer*, 519 U.S. at 461)).[13] Because FWS's interpretation of "potentially threaten" is not plainly erroneous or inconsistent with the MBTA or its regulations, it is controlling.

FWS agreed that the western population of DCCOs "is sustainable around 41,660 breeding individuals," which is the DCCO population circa 1990. FWS_00001596. FWS also emphasized that choosing the circa 1990 population figure as sustainable was based on it being a "known data point in time" and that the "western population has increased from numbers much lower than described for ca. 1990." *Id.* Thus, FWS concurred with the DCCO final EIS's conclusion that the western population would likely rebound even if the DCCO population was temporarily reduced below 41,660 breeding individuals, the circa 1990 level. *Id.* FWS noted that

---

[13] *But see Decker v. Nw. Env't Def. Ctr.*, 133 S. Ct. 1326, 1338 (2013) (Roberts, C.J., concurring) ("It may be appropriate to reconsider that principle [*Auer* deference] in an appropriate case. But this is not that case.").

the DCCO population is expected to be approximately 45,000 breeding individuals 20 years post-management. *Id.*

Plaintiffs note that the modelling used by FWS includes a range of one "standard deviation" and that with such a deviation, the western population would remain below the circa 1990 levels even after 20 years. Thus, Plaintiffs argue, FWS's determination that the western population of DCCOs will not be potentially threatened is arbitrary and capricious. The Court disagrees.

FWS is the agency that proposed the fourth alternative in the DCCO final EIS, alternative C-1, which ultimately was selected as the preferred alternative. This alternative decreased the take of adult breeding DCCOs and increased reduction through egg oiling and nest destruction, which "leaves more breeding adults in the population." FWS_00001583. This alternative also made changes to the population model parameters "to incorporate a future reduced carrying capacity scenario to account for potential long-term threats and risks to the western population of Double-crested Cormorants." *Id.* It also revised the adaptive management strategy "for alternatives considering lethal take to adjust take levels dependent upon information received from annual monitoring of the western population of Double-crested Cormorants, per the Pacific Flyway Council Monitoring Strategy." FWS_00001583-84.

FWS evaluated the long term population trend of the western DCCO population, which FWS notes is "the determining factor for sustainability and whether a population will potentially become threatened." FWS_00001596. FWS concluded that with the requested culling, particularly considering the "well-monitored and adaptive management framework," the long term population trend demonstrates that the western population will remain sustainable.

FWS_00001577, 1596. FWS made this scientific determination based upon its expert modeling and scientific expertise.

Modelling projections of DCCO populations after the culling operation is not an exact science. Such determinations are within the expertise of FWS and are entitled to deference by the Court. The Court does not find that FWS's conclusions here have no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).

The Court also finds that FWS's conclusion that the Corps demonstrated a valid justification for the depredation permit because DCCOs consume millions of juvenile salmonids, without performing additional analysis on compensatory morality, is neither arbitrary nor capricious. As discussed above, the science is uncertain and there is scientific data indicating that DCCO predation on salmonids is neither fully additive nor fully compensatory. DCCO predation thus does cause at least some reduction in steelhead and salmon productivity. FWS's conclusion that the depredation permit is warranted in order to reduce harm to endangered and threatened salmonids is neither arbitrary nor capricious. Accordingly, Plaintiffs' motion for summary judgment is denied on Claims Six and Seven, and Defendants' cross-motions are granted on those claims.

**D.  The Alleged Violations of the WRDA**

In Claim Six, Plaintiffs allege that the Corps violated the WRDA. Plaintiffs argue that the WRDA only authorizes lethal take of DCCOs pursuant to a management plan developed by FWS and that no such management plan has been developed. Defendants respond that Plaintiffs lack standing to bring such a claim and that even if Plaintiffs could bring such a claim, it fails on the merits. Plaintiffs reply that statutory standing is not needed because they are alleging that the Corps is acting outside of its statutory authority. The Court does not reach the issue of standing

PAGE 33 – OPINION AND ORDER

because even if Plaintiffs do have standing, the Court rejects Plaintiffs' arguments on the merits for two reasons.

First, FWS has developed a national plan for the management of DCCOs. FWS_00059726-993. This plan notes the increases in DCCO population in East Sand Island and the non-lethal hazing actions taken by agencies in Oregon. FWS_00059741, 59756. The management actions in the plan include killing DCCOs, oiling eggs, and destroying nests. FWS_00059781. The plan recognizes that additional adult DCCOs will be killed under the preferred alternative and provides for a depredation order for 24 states (but not including Oregon). FWS_00059747-48. 786. The plan expressly acknowledges that the take under the plan is additive to the birds taken under individual depredation permits. FWS_00059786. The plan provides that for states, such as Oregon, that are not covered under the new depredation order, "depredation permits for public resource damages will be issued in accordance with 50 C.F.R. 21.41, and applicable [agency] policies." FWS_00059748. The Court finds that this plan is sufficient to satisfy the WRDA's requirement that DCCO lethal take be pursuant to a plan developed by the FWS.

Second, even if the national DCCO plan were not a sufficient "management plan" under the WRDA, FWS was sufficiently involved in the development of the DCCO management plan and final EIS to satisfy the WRDA. FWS was a part of the interagency work group that developed the DCCO management plan, was a cooperating agency in the development of the DCCO final EIS, was the agency that proposed the alternative (C-1) that became the preferred alternative, and was the agency that developed the population models used in finalizing the EIS. Additionally, an FWS biologist was a co-author of the DCCO final EIS. The extensive involvement of FWS in the development of the DCCO management plan and final EIS is

sufficient for the DCCO plan to be considered a plan "developed" by FWS. Plaintiffs' motion for summary judgment is denied on Claim Six and Defendants' cross-motions are granted.

## CONCLUSION

Plaintiffs' Motion for Summary Judgment (ECF 78) is GRANTED IN PART AND DENIED IN PART. The Federal Defendants' Motion for Summary Judgment (ECF 85) and RiverPartners' Motion for Summary Judgment (ECF 84) are GRANTED IN PART AND DENIED IN PART. The Court grants summary judgment in favor of Plaintiffs on Claim One and in favor of Defendants on all remaining Claims. For Claim One, the Court finds that the Corps and FWS violated NEPA by failing properly to consider reasonable alternatives in developing the management plan for Double-crested Cormorants. The Court, however, leaves the Double-crested Cormorant plan and challenged Records of Decision in place because the plan provides some benefit to salmonids that are listed as endangered or threatened under the Endangered Species Act, whereas Double-crested Cormorants are not listed as either endangered or threatened.

**IT IS SO ORDERED**.

DATED this 31st day of August, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge